# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                      No. 18-cr-2429-WJ

DARREN BENALLY,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS CUSTODIAL STATEMENTS TO LAW ENFORCEMENT</u>

THIS MATTER comes before the Court following a hearing on *Defendant Darren Benally's Motion to Suppress Custodial Statements to Law Enforcement and Memorandum in Support* (**Doc. 32**, filed 8/23/18). Having reviewed the pleadings of the parties, considered the testimony and evidence presented at the October 15, 2018 suppression hearing, and considered the oral arguments of counsel and the applicable law, the Court finds that Defendant's motion is not well-taken and, therefore, is **DENIED**.

Defendant Darren Benally ("Defendant") filed the instant *Motion to Suppress Custodial Statements to Law Enforcement* (Doc. 32) on the grounds that Defendant did not receive an adequate *Miranda* warning because it was delivered to him in English, and that he did not knowingly and intelligently waive his *Miranda* rights. The Court held a suppression hearing on October 15, 2018, during which the Government submitted the testimony of four witnesses.[1] The Government presented the testimony of Shiprock Police Officer Lojann Dennison, FBI Special

---

[1] Testimony from the October 15, 2018 suppression hearing is found in the transcript, cited as "Tr." followed by page number and line number. *See* Doc. 62. The Court will provide citations for direct quotations from testimony and specific arguments, but there are no citations for background and testimony on undisputed facts.

Agent Jeffrey Wright, San Juan Spring Company Machine Shop supervisor Ronald Johnson, and San Juan College faculty member John Hoff. Both parties submitted argument and exhibits, including the audio recording of the interrogation of Defendant (Government Ex. 1) and the transcript of the audio recording (Government Ex. 1A, Defense Ex. A),[2] which were admitted without objection. Prior to the hearing, the Government had maintained that although Defendant was interrogated, he was not in custody and the *Miranda* requirement thus did not apply to the interrogation. At the hearing, however, the Government changed its position and conceded that Defendant was in a custodial interrogation, and, therefore, the *Miranda* warning was required. Tr. at 101:18–21. The Court now finds that the evidence shows that Defendant understood the *Miranda* warning delivered in English to the degree required by the Supreme Court of the United States and the Court of Appeals for the Tenth Circuit, and that Defendant did knowingly and intelligently waive his *Miranda* rights on March 27, 2018.

## BACKGROUND

### I. Factual findings

In the evening of March 27, 2018, the Shiprock Police dispatch received a call reporting a male bleeding from the head. Shiprock Police Officer Lojann Dennison ("Officer Dennison") responded to the scene near the Sanostee Chapter House in Sanostee, New Mexico, at approximately 8:22 p.m.[3] John Doe's body was on the ground, covered with a blanket. Officer Dennison questioned witnesses at the scene and called for an investigator from the Navajo Department of Criminal Investigations.

---

[2]    The transcript of the recorded interrogation is cited as "Ex. 1A" followed by page number and line number.

[3]    Sanostee, New Mexico, is within the exterior boundaries of the Navajo Nation Indian Reservation.

Prior to the criminal investigator or FBI special agent arriving, Officer Dennison detained Defendant by placing him in the backseat of her marked Navajo Police Department vehicle, where Defendant remained for up to three hours. Officer Dennison did not place any restraints on Defendant, and Defendant was free to move in the backseat of the Navajo Police vehicle. The back doors were locked and could only be opened from outside of the vehicle. Defendant did not ask to use the restroom or to exit the vehicle, although he did complain in English about his legs feeling cramped. Officer Dennison advised Defendant in English that he could sit sideways in the backseat. Officer Dennison did not interrogate Defendant, but she did ask him for identifying information including his name, date of birth, Social Security number, his address and P.O. Box number. She did not Mirandize Defendant before or after asking him about his identifying information. She testified that she asked these question in English and he responded appropriately in English. Tr. at 10:19–11:1. Officer Dennison testified that, in her opinion, Defendant was not free to leave the vehicle. Tr. at 22:25–23:1.

Navajo Criminal Investigator Wilson Charley ("CI Charley") arrived at the scene, as did FBI Special Agent Jeffrey Wright ("SA Wright"). It is not clear from the record the exact times that CI Charley and SA Wright arrived at the scene, but both were there by about 10:30 p.m. SA Wright is based in Farmington, New Mexico, and is tasked primarily with investigating crimes that occur in Indian Country. SA Wright testified that when he arrived at the scene, he was dressed in civilian clothes and that his badge and weapon were covered. He testified that CI Charley was dressed in a similar manner, and that CI Charley's weapon and badge were also covered. Sometime close to 11:30 p.m., SA Wright and CI Charley met Defendant and escorted him from the Navajo Police vehicle to CI Charley's unmarked police vehicle. SA Wright asked Defendant to sit in the front passenger seat of CI Charley's vehicle, while SA Wright sat in the driver's seat and CI

Charley sat in the back seat behind Defendant. CI Charley's vehicle was an unmarked police SUV that had the appearance of a civilian vehicle. It was approximately 34 degrees outside, and CI Charley's vehicle provided heat and privacy. The doors of the vehicle remained unlocked during the interview and Defendant was never handcuffed during the interrogation.

CI Charley and SA Wright (collectively "agents" for ease) conducted a recorded interrogation of Defendant from 11:34 p.m. to 12:51 p.m. in CI Charley's vehicle (one hour and seventeen minutes). *See* Ex. 1 (audio recording) and Ex. 1A (recording transcript). Prior to delivering the *Miranda* warning, SA Wright asked Defendant biographical and identifying information, including his full name, Social Security number, birthdate, physical address, where he was employed, and some educational background. Ex. 1A at 2–6. Before reading the *Miranda* warning, the following exchange took place regarding the Advice of Rights Form (Government Ex. 2):

SA WRIGHT: And so it's important for us just to find out, you know, everything we can, whatever bits of information that you think might be helpful for us, so that we can figure that out. All we care about is -- is truth. That's it. We're just trying to -- to find out, you know, the truthfulness of any situation. And, you know, my understanding is you were out here. And -- and you can kind of help give from what you saw, heard, smelled, you know, everything just that you can remember to help kind of piece that together. Does that make sense?

MR. BENALLY: Yeah.

SA WRIGHT: And so we want to go over that. Now, before we talk to you, we always like to go over -- I don't know if you watch TV or movies. We always go over advice of rights and things --

MR. BENALLY: Uh-huh.

SA WRIGHT: -- just to make sure you understand what those things are. And if you have any questions, feel free to ask them to me, too. Do you read -- do you read English well?

MR. BENALLY: Uh, not --

SA WRIGHT: Or do you want --

MR. BENALLY:  -- not -- not --

SA WRIGHT:  -- me to read it to you?

MR. BENALLY:  Yeah, yeah.

SA WRIGHT:  It's late, too.

MR. BENALLY:  Yeah.

SA WRIGHT:  So I understand that, also, you know.

MR. BENALLY:  No.

SA WRIGHT:  Um --

MR. BENALLY:  English wasn't my first language, but --

SA WRIGHT:  Yeah.

MR. BENALLY:  I -- I -- I -- I kind of know it.

SA WRIGHT:  You speak Navajo?

MR. BENALLY:  Yeah.

SA WRIGHT:  Man, talk about a tough language.  That's one that I -- I wish I had down.

Ex. 1A at 6:25–8:15. SA Wright then explained that he was filling out the date and time on the

waiver form and that he was going to read the form to Defendant. SA Wright read the following:

Before we ask you any questions, you must understand your rights.  You have the
right to remain silent.  Anything you say can be used against you in court.  You
have the right to talk to a lawyer for advice before we ask you any questions.  You
have the right have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning,
if you wish. If you decide to answer questions now without a lawyer present, you
have the right to stop answering at any time.

Tr. at 9:3–14. The following exchange took place after Defendant was Mirandized:

SA Wright: And then do you have any questions on any of those things there? I mean, do
you they make sense, more or less?

MR. BENALLY:  Yeah.  And the last one, the --

SA WRIGHT: The last one? So the last one is just, I mean, obviously, what -- anything that we're talking about --

MR. BENALLY: Uh-huh.

SA WRIGHT: -- is just, you know -- these are -- it's just a voluntary statement from you. So at any time if you're, like, "Hey, I don't," you know -- I -- I don't want to talk anymore, you – then all you've got to do is say so.

MR. BENALLY: Oh.

SA WRIGHT: Okay? That's saying you have the right at any time to say, "Hey, like, yeah, that's -- you know, I'm -- I'm good talking now."

MR. BENALLY: Oh.

SA WRIGHT: So here at the end, it's just a statement. It says, "I have read this statement" -- or I've read them to you -- "of my rights, and I understand my what rights are. And at this time, I am willing to answer questions without a lawyer present." Are you willing just to talk to us for a few minutes?

MR. BENALLY: Uh, you -- you said I have to have a lawyer first?

SA WRIGHT: No. So this -- this is saying that -- that if you're willing to talk to us right now, like, without a lawyer sitting here in the car, that you'd be willing just to talk to us right now—

MR. BENALLY: Oh.

SA WRIGHT: -- and that at any time if you feel, you know, uncomfortable and don't want to keep talking about anything, then you can say so.

MR. BENALLY: Okay.

SA WRIGHT: Does that make sense to you?

MR. BENALLY: Yeah.

Ex. 1A at 9:15–11:2. All parties in the vehicle then signed the waiver form, dated March 27, 2018 at 11:42 p.m. Government Ex. 2. Officer Dennison spoke with the agents after the FBI interrogation,[4] and based on the information they conveyed to her, she placed Defendant under

---

[4]     The content of Defendant's statements during the custodial interrogation are not relevant to his Motion to Suppress, so the Court will not describe them herein.

arrest. She transported to the Navajo Nation adult detention center for booking. Defendant was later federally indicted for second-degree murder. Doc. 26.

## II.     Suppression hearing testimony relevant to *Miranda* warning and waiver

### A.     SA Wright's testimony

SA Wright spent about the first four to five minutes of the recorded interrogation asking biographical questions in English, such as Defendant's full name, birth date, Social Security Number, P.O. Box number, physical home description, and parents' names. Ex. 1A at 2:22–5:4. SA Wright also asked Defendant where he grew up, where he went to high school, where he was employed at the time, and what kind of work he performed. Ex. 1A at 5:6–6:12. SA Wright testified, "I asked him for just his biographical information to identify who he is. That way I can ensure that I'm talking to the person that I want to be talking with and know who that person is." Tr. at 43:24–44:2. SA Wright testified that he also asks these questions to assess whether there is an "impediment" to the interview. Tr. at 44:14–22. SA Wright stated that an "impediment" that would cause him to cease an interview would be if a suspect was intoxicated, on medication, high on a narcotic, or if there were "any language issues." *Id.* SA Wright testified that based on Defendant's responses, he determined there was no "impediment" to proceeding with the interview. Tr. at 44:14–45:11. SA Wright stated that Defendant appeared to understand the initial questions and that Defendant's responses to the biographical questions were appropriate. Tr. at 45:5–11. SA Wright stated, "I didn't ask any questions specific to the incident, the allegation, prior to Miranda." Tr. at 80:8–9. SA Wright further testified that it was his understanding that Defendant was not free to leave while detained in Officer Dennison's police vehicle, and that Defendant was not free to leave once SA Wright arrived at the scene.

On cross-examination, defense counsel asked SA Wright about Defendant's interjection of "uh-huh" when SA Wright was just beginning to explain the Advice of Rights form to Defendant in the recording. Tr. at 62:13–17; *see* Ex. 1A at 7:12–20.[5] SA Wright testified that he understood Defendant's interjection of "uh-huh" to be "a confirmation that they are listening and they understand what you are saying." Tr. at 62:13–24. SA Wright provided that he interpreted "uh-huh" as a confirmation because Defendant said it in the middle of SA Wright's sentence, and that SA Wright had not asked Defendant a question but rather was explaining something to Defendant. Tr. at 62:24–63:2.

Following that exchange, SA Wright asked Defendant if he "read English well?" Ex. 1A at 7:17–20. Defendant indicated that his primary language was Navajo and that he "kind of" knew English. Ex. 1A at 8:7–13. SA Wright testified that based on this interaction, he understood Defendant's "comfort level with reading wasn't very high." Tr. at 46:19–20. SA Wright testified that he did not consider requesting a Navajo translator "at that point or any point throughout the interview," Tr. at 47:15–16, because SA Wright "felt comfortable that [Defendant] spoke English." Tr. at 47:23. SA Wright explained his opinion at that time as:

> We had been talking for several minutes prior to that. He provided me a fair amount of information. We were having a very normal and comfortable conversation with each other at which point I never felt like I wasn't understanding him, and he appeared to understand everything I said. So basically, I felt comfortable that he spoke English.

Tr. at 47:18–23. SA Wright explained that he "understood that [defendant] felt he didn't read very well, but there was never any assertion nor did I ever sense any confusion or misunderstanding as

---

[5]       SA WRIGHT: And so we want to go over that. Now, before we talk to you, we always like to go over ---I don't know if you watch TV or movies. We always go over advice of rights and things --
          MR. BENALLY:  Uh-huh.
          SA WRIGHT: -- just to make sure you understand what those things are. And if you have any questions, feel free to ask them to me, too. Do you read -- do you read English well?

far as speaking or understanding me as well." Tr. at 80:14–17. SA Wright testified that to ensure Defendant's understanding of the Advice of Rights form, Government Ex. 2, he read the form to Defendant. SA Wright testified that he read the Advice of Rights form verbatim, and he identified the signatures on the form as being his own, Defendant's, and CI Charley's. SA Wright stated that Defendant did not give any indication that he did not understand the warnings. Tr. at 51:9–11. He described Defendant's demeanor as "calm, cooperative, fairly soft-spoken." Tr. at 51:14–15.

SA Wright testified that after he read the Advice of Rights form, he further ensured Defendant's understanding of the *Miranda* warning by asking if Defendant had any questions. Defendant responded with a question about the "last one," meaning the last right that SA Wright read, and with a question about whether he had to have a lawyer present. Ex. 1A at 9:18–19, 10:15–16. SA Wright offered clarifications on these questions, to which Defendant responded three times with "Oh." Ex. 1A at 10:4, 8, 21. SA Wright testified that he understood "Oh" as an affirmation and not as a question. Tr. at 68:1. He testified this was because "[i]n Navajo, 'oh' also means yes, so it could be interpreted that way. I interpreted that he understood my statement that I was saying to him." *Id.* at 68:11–13. When defense counsel noted that SA Wright did not ask Defendant whether he was responding in English or in Navajo, SA Wright stated, "We were speaking in English the whole time, and so to me, that's just an affirmative response in English." Tr. at 75: 12–16. SA Wright also testified to the following:

> Q: And he asked if he needed to have a lawyer first, correct?
> A: That's correct.
> Q: You said no. Correct?
> A: That's correct. So I went on to explain there when he said, "You said I have to have a lawyer first." So he didn't ask me if he needed one. He asked me if I said he needed one, and so I told him no.

*Id.* at 68:22–69:3. On cross-examination, SA Wright admitted that he did not specifically say the words "constitutional rights" when giving the *Miranda* warning. *Id.* at 66:18–21. When asked,

"How did you know that he understood what his rights were and the consequences of his waiver?",

SA Wright responded

> I read the rights out loud to him. I asked if he had any questions. He brought up the question about the last right. We talked about it for a moment. I asked him a couple of times if he understood, and as we pointed out through our conversation now, he said, "Oh, oh, okay," and did not bring up any other questions during that time.

Tr. at 71:24–72:6. SA Wright confirmed that he did not think a Navajo translator was required because "[w]e were speaking in English throughout the whole conversation, and never at once did I feel uncomfortable with our conversation." Tr. at 75:17–21.

### B. Ronald Johnson's testimony

The Government called as its third witness Ronald Johnson, who is the foreman for an industrial machine shop in Farmington where Defendant was employed. Mr. Johnson testified that he has known Defendant for five years and that Defendant worked for him as a welder at the shop in Farmington. Mr. Johnson's duties as foreman include assigning responsibilities to employees, which he explains in English. Mr. Johnson stated that he does not speak Navajo. Mr. Johnson provided that when he delivered instructions verbally in English, Defendant appeared to understand the assigned tasks and responded appropriately. The welding drawings that Mr. Johnson provided to Defendant contained English words, as well. Defendant never expressed to Mr. Johnson if Defendant did not understand the instructions and Defendant never requested a translator at work. Mr. Johnson testified that Defendant "did a good job," Tr. at 84:14, and he would re-hire Defendant, given the opportunity.

On cross-examination, defense counsel asked Mr. Johnson about his assistant foreman, Bob Sandoval. Mr. Johnson testified that Mr. Sandoval did speak Navajo, and that he heard Defendant and Mr. Sandoval conversing in Navajo on occasion. Mr. Johnson testified that part of his assistant foreman's duties was answering questions about the assignments Mr. Johnson gave

out. Mr. Johnson clarified on re-direct that when he spoke directly with Defendant, he did not use Mr. Sandoval as a translator, and that Defendant responded appropriately when Mr. Johnson addressed him in English.

### C.     John Hoff's testimony

The Government called as its final witness John Hoff, who is employed as the coordinator of the welding and metal fabrication department at San Juan College in Farmington. Mr. Hoff has taught in the San Juan College welding department for twenty-six years. He testified that he teaches Blueprint Reading for Welders, which is a class he administers through lecturing, discussion, group activities, demonstrations on the board, and textbooks and lab lessons. Mr. Hoff teaches the class in English, and the lab manual and two textbooks are written in English. He provided that the textbooks are "fairly advanced" and that the materials are at about a tenth to eleventh grade reading level. Mr. Hoff testified that the class meets twice a week over the semester, and that he issues daily quizzes and an 11–14-page cumulative final at the end of the semester. He provided that students must obtain 70% or higher to pass a trades or technology course at San Juan College.

Mr. Hoff identified his signature on Government Exhibit 5, which he provided is a certificate of completion he issued to Defendant for the Blueprint Reading for Welders course. Mr. Hoff also testified about Defendant's transcript (Defendant Ex. B), which Mr. Hoff said indicates that Defendant passed the Blueprint Reading for Welders course "satisfactorily and above" because he received a "B." He also testified that Defendant received a "B" in a 2014 English course listed on the transcript. Mr. Hoff testified that the transcript reflects that there were several classes in which Defendant did not receive a passing grade, and that there were also some courses that Defendant repeated. On cross-examination, Mr. Hoff explained it was not strange for students to

retake courses. He testified that, in his opinion, Defendant "would fall into the average or—you know, middle average, low average" range of comprehension and learning. Tr. at 98:17–18.

Mr. Hoff agreed with the Government's statement that a student must understand verbal and written English to pass the exams and obtain the certificates provided as Government Exhibits 3–7, all of which indicate Defendant successfully competed welding courses. Tr. at 93:3–5. Mr. Hoff testified, "[Defendant] understood me in English. Sometimes we discussed things a little more detailed, but we spoke in English, and he did understand." Tr. at 95:15–17. Mr. Hoff stated he does not speak Navajo. When defense counsel asked, "So could a student get by as a Navajo— primary Navajo speaker if they came in with outside knowledge of welding and blueprints?" Mr. Hoff replied, "I don't believe so." Tr. at 96:15–18.

## DISCUSSION

### I.    Relevant law

The Government carries the burden to establish a valid *Miranda* waiver by a preponderance of the evidence. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *see Miranda v. Arizona*, 384 U.S. 436 (1966). The Supreme Court of the United States has provided that, when determining whether a *Miranda* waiver is valid,

> [t]he inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). Defendant does not argue that his statements were obtained involuntarily.[6] Rather, he claims that he did not knowingly and intelligently waive his *Miranda* rights and he did not comprehend the rights as read to him in English. Thus, the inquiry into the legal issue of whether Defendant knowingly and intelligently waived his *Miranda* rights begins with a factual determination of whether Defendant understood the *Miranda* warnings in English. *Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000) ("Whether [a defendant] understood his *Miranda* rights is a question of fact, which underlies the legal question of whether his waiver was knowing and intelligent[.]" (citations omitted)); *see also United States v. Sanchez-Chaparro*, 392 F. App'x 639, 644 (10th Cir. 2010) (citing *Valdez*, 219 F.3d at 1231); *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) (explaining that whether *Miranda* waiver should have been read in another language is a factual determination by the court).

The Tenth Circuit has repeatedly affirmed district court findings that a defendant sufficiently understood *Miranda* warnings in English when the record shows that the defendant responded appropriately to officers in English. *See Sanchez-Chaparro*, 392 F. App'x at 644 (explaining "we cannot conclude that the district court clearly erred in finding that defendant understood sufficient English to understand the *Miranda* warnings" because the defendant conversed with officers in English); *United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999) ("Although it would have been preferable to give [defendant] a *Miranda* warning in Spanish, the record indicates that [defendant] indicated to [the officer] that he understood those rights as they were being read to him in English, and responded to all questions in English."); *United States v. Toro-Pelaez*, 107 F.3d 819, 826 (10th Cir. 1997) (upholding *Miranda* waiver when defendant

---

[6]   Defendant concedes the voluntariness requirement and the Court has no reason to believe there was an issue of coercion during the interrogation. Doc. 32 at 15. While some of the case law addresses this issue under the voluntariness requirement, the parties have argued it under the knowing and intelligent requirement, and the Court is persuaded this is the proper legal approach.

spoke to state troopers in English). The District of Kansas has opined that when determining whether a defendant comprehended the *Miranda* warning in English, "the courts consider what effort the officer made to communicate, whether the defendant responded that he understood his rights or ever indicated that he did not understand them, and what the defendant displayed in English language skills." *United States v. Castorena-Jaime*, 117 F. Supp. 2d 1161, 1171 (D. Kan. 2000) (citing *United States v. Bernard S.*, 795 F.2d 749 (9th Cir. 1986)). Similarly, in *United States v. Tellez*, the Seventh Circuit relied on four relevant facts in upholding the district court's determination that Defendant sufficiently understood English to waive his *Miranda* rights: the defendant indicated that he understood English; the defendant conversed in English rather than Spanish; the defendant had resided in the United States for over fifteen years; and the defendant gave answers in English to open-ended questions by law enforcement agents. 586 F. App'x 242, 244–45 (7th Cir. 2014) ("Although [defendant] may not be fluent in English, courts have concluded that English-spoken responses and English skills similar to [defendant's] are sufficient to render a knowing waiver." (citations omitted)).

## II.    Defendant understood the *Miranda* warning in English

Considering the testimony of the Government's witnesses and the exhibits, the record supports the factual determination that Defendant understood sufficient English to comprehend the *Miranda* rights read to him in English. First, Defendant responded appropriately to SA Wright's initial biographical questions by providing the correct personal identifying information, as well as information about his parents and his employment. An examination of the biographical questions and answers in the first six pages of the recording transcript, Ex. 1A, reveals that Defendant was attentive and engaged in speaking with SA Wright. The questions were not complicated and did not involve legal concepts, but they required Defendant to respond accurately and listen

purposefully. SA Wright used this interaction to assess Defendant's ability to understand English, and, after learning that Defendant's primary language was Navajo, SA Wright determined a translator was not necessary. He testified that "[w]e were having a very normal and comfortable conversation with each other at which point I never felt like I wasn't understanding him, and he appeared to understand everything I said. So basically, I felt comfortable that he spoke English." Tr. at 47:18–23. The Court credits this testimony by SA Wright because it is supported by the audio recording of the interrogation, which reflects the ease of conversation even in the beginning during the biographical questions.

Throughout the interrogation, Defendant answered questions from the agents without difficulty in English. SA Wright testified that Defendant "responded appropriately throughout the whole interview, whether that was a simple short answer or whether that was providing a lengthier narrative description." Tr. at 45:7–11. The flow of the conversation was not forced, and the agents asked open-ended questions on a range of topics. In a few notable examples, Defendant responded appropriately to SA Wright's questions about whether anyone else was involved in the alleged altercation and what Defendant was doing when the altercation started (Tr. at 58:9–59:24), where Defendant's tools were located (Tr. at 59:19–60:23), whether there were previous fights between Defendant and John Doe (Tr. at 61:6–22), whether Defendant had an electronic surveillance system in place and whether the cameras were recording (Tr. at 62:1–63:25), what kind of toolbox Defendant had (Tr. at 69:2–70:2), and about the corral and sheep pens near the scene (Tr. at 71:17–72:9). These questions required more of a command of English than the biographical questions, but Defendant continued to provide answers about his history with John Doe and how the altercation occurred without indicating that he was struggling to comprehend or respond orally in English.

The quality of Defendant's interactions at the scene with Officer Dennison, CI Charley, and SA Wright is more than enough for the Court to conclude that Defendant displayed adequate conversational skills and comprehension in English. Tenth Circuit law does not require an extensive vocabulary, complex sentence structure, or fluency in English for *Miranda* warnings in English to be valid. *See Valdez*, 219 F.3d at 1231 (noting defendant "had some limitations in his ability to speak English" and used an interpreter at trial, but that the record supported determination that he understood sufficient English for valid *Miranda* waiver); *Toro-Pelaez*, 107 F.3d at 823 (describing officer's observation that "English was probably not [defendant's] native language" but that defendant "was capable of understanding and communicating in English"). Instead, the Court looks to the nature of the interactions between Defendant and the agents, which in this case indicate that Defendant conversed in English with SA Wright on a range of topics for over an hour. *See Sanchez-Chaparro*, 392 F. App'x at 644 (examining recorded conversation between defendant and officers to conclude that defendant understood *Miranda* waiver). SA Wright assessed Defendant's English-speaking ability by asking biographical questions to ensure that Defendant adequately understood spoken English. Defendant indicated that he did not read English well, but Defendant did not express that he did not understand any questions due to lack of spoken English comprehension, either prior to or after being Mirandized. SA Wright read the Advice of Rights form to Defendant, which is adequate to ensure Defendant understood the *Miranda* rights.

The testimony of Ronald Johnson and John Hoff further supports the finding that Defendant understood the *Miranda* rights and waiver. Both men testified that they only interacted with Defendant in English, and that Defendant responded appropriately in their interactions. These witnesses also testified about their satisfaction with Defendant's performance, which involved technical welding skills and instructions. Mr. Johnson stated that Defendant was a good worker

and he would re-hire him, and Mr. Hoff testified about Defendant's completion of Blueprint Reading for Welders with a grade of "B."

Any conversations Defendant had in Navajo with the assistant foreman, Mr. Sandoval, do not weigh against the Court's findings on this issue. Because Mr. Sandoval did not testify about the content of those conversations, the Court will not speculate about what the men discussed in Navajo. Mr. Johnson testified that it is the assistant foreman's job to answer questions about assignments, and Mr. Johnson further testified that he interacted directly with Defendant without using Mr. Sandoval as an interpreter. Without more, the fact that Defendant spoke to the assistant foreman in Navajo in their workplace does not support Defendant's proposition that he did not sufficiently comprehend English to understand a *Miranda* warning.

Additionally, the Court notes that Defendant's transcript does reflect that he did not pass some classes at San Juan College, including an English class and a welding course, both in 2012. *See* Defendant Ex. B. Defendant also passed several classes with a grade of "B," including an English class in 2014 and the Blueprint Reading for Welders course in 2012 about which Mr. Hoff testified. *See id.* There is no clear correlation between the passing or failing of these classes, and the Court will not speculate about why Defendant did not pass those classes. The record supports the inference that in the cases in which Defendant did not pass a course, it was not solely based on a lack of English comprehension because Defendant passed a number of classes and he both passed and failed English classes. The textbooks in Mr. Hoff's course require a tenth or eleventh grade reading level and Defendant received a "B" in the course. Furthermore, Mr. Hoff responded that he did not think a primary Navajo speaker could get by in his class with outside knowledge of welding and blueprints, which is persuasive evidence of Defendant's English comprehension.

Finally, the Court addresses Defendant's argument that his use of an appointed Navajo interpreter for court proceedings supports his position that his English comprehension was insufficient to understand the *Miranda* warnings. Doc. 47 at 11. The Court notes that it conducted a *Lafler-Frye* colloquy with Defendant prior to the commencement of the suppression hearing, in which Defendant used the services of a court interpreter. Defense counsel also points out that she sometimes uses a Navajo interpreter when meeting with Defendant. Doc. 47 at 12. The Court Interpreter's Act provides the presiding judicial official with discretion over the appointment of a court interpreter for judicial proceedings, and many courts exercise caution in this determination. 28 U.S.C. § 1827(d)(1); *United States v. Osuna*, 189 F.3d 1289, 1292 (10th Cir. 1999) ("[A]ppointment of an interpreter is discretionary and . . . the necessity for an interpreter is a question of fact."). In *United States v. Granados*, the District of Kansas explained that

> [c]omparing the complexity and breadth of what is typically done and said in the courtroom with what is involved in the *Miranda* warning, limited English skills may suffice to understand the latter but not former. For that matter, judges are more likely to err on the side of caution when it comes to deciding if an interpreter is necessary.

846 F. Supp. 921, 925 (D. Kan. 1994). Other courts that have dealt with this issue have noted that the appointment of a translator is not dispositive to whether a defendant understood his *Miranda* rights. *See, e.g.*, *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding that defendant's "command of English was sufficient for him to have understood the *Miranda* warnings given to him" despite using a court-appointed interpreter); *United States v. Bernard S.*, 795 F.2d 749, 752 (9th Cir. 1986) (ruling that although defendant used Apache interpreter at trial, the defendant knowingly waived his rights because he told the officer he understood the *Miranda* rights in English and never indicated that he did not understand them); *United States v. Abou-Saada*, 785 F.2d 1, 10 (1st Cir. 1986) (rejecting the argument "that the very fact the government provided him

with an interpreter indicates a lack of knowledge of English"); *Granados*, 846 F. Supp. at 925 (finding court translator necessary for proceedings but ruling defendant understood *Miranda* warnings in English); *cf. United States v. Short*, 790 F.2d 464, 469 (6th Cir. 1986) (ruling *Miranda* warning insufficient in English when German national resided in United States for three months, spoke only broken English, and had no familiarity with the justice system).

The Court agrees that the use of a Navajo interpreter ensures Defendant will not be inhibited from comprehending these proceedings or communicating with his counsel, as required by 28 U.S.C. § 1827(d)(1). Additionally, the Court notes it is a prudent decision by defense counsel to use an interpreter when appropriate to ensure accurate conveyance of information to and from Defendant in their own meetings. The issues of whether it is appropriate to use a court interpreter and whether a defendant understood his *Miranda* rights are not subject to the same legal standard, however, and the answer to the first question is not dispositive to the second. Here, the use of a court translator does not overcome the evidence in the record that shows Defendant's comprehension of English was sufficient to understand the *Miranda* warnings delivered in English. Courtroom proceedings are of a complex nature not mirrored by the basic language of the *Miranda* advisement precisely because the *Miranda* advisement is supposed to convey legal rights to people without legal training.

For these reasons, the Court finds that the record supports the determination that Defendant understood adequate English to comprehend the *Miranda* warning delivered by SA Wright. Defendant's conversation in English with SA Wright for over an hour demonstrates his ability to sufficiently communicate in English with the agents, and Tenth Circuit law has found that the interactions between a defendant and officers provide a strong indication of whether a defendant understood his *Miranda* rights. *See* Sanchez-Chaparro, 392 F. App'x at 644; *Lugo*, 170 F.3d at

1004. During the interrogation, Defendant did not indicate to the agents that he did not understand spoken English and his answers were fitting and varied. Furthermore, the testimony from the foreman, Ronald Johnson, reflects that Defendant responded appropriately to instructions delivered in English in the shop. Finally, his college transcript and John Hoff's testimony about the reading comprehension required to obtain a "B" in the welding class shows that Defendant had an adequate command of English. Under Tenth Circuit law, even in an instance in which it would have been "preferable" to read a defendant his *Miranda* rights in his primary language, when "the record indicates that [the defendant] indicated to [the officer] that he understood those rights as they were being read to him in English, and responded to all questions in English[,]" then a motion to suppress subsequent statements is properly denied. *Lugo*, 170 F.3d at 1004.

## III.    Defendant knowingly and intelligently waived his *Miranda* rights

Having determined that Defendant understood the *Miranda* rights read to the him in English, the Court now turns to whether Defendant knowingly and intelligently waived his *Miranda* rights. *See Sanchez-Chaparro*, 392 F. App'x at 644 (affirming that defendant knowingly and intelligently waived his *Miranda* rights upon court's determination that he understood rights in English); *Valdez*, 219 F.3d at 1231 (same). The Tenth Circuit has explained that when deciding if the waiver was knowing and intelligent, the court examines whether "the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) (citation omitted), cert. denied, 499 U.S. 908 (1991). There is no requirement that a defendant understand "the tactical advantage of remaining silent" for the waiver to be valid. *Id.*; *see also United States v. Hernandez*, 93 F.3d 1493, 1503 (10th Cir. 1996) ("A defendant need not be advised of every possible consequence of a waiver of the Fifth Amendment privilege." (citing *Colorado v. Spring*, 479 U.S. 564, 574 (1987)). The Tenth Circuit has provided that "[o]nly if the totality of the circumstances

surrounding the interrogation shows both an uncoerced choice and the requisite level of comprehension can a waiver be effective." *United States v. Toro-Pelaez*, 107 F.3d 819, 825 (10th Cir. 1997). District courts have noted that "[l]anguage barriers are a factor to consider [concerning] a suspect's ability to act knowingly and intelligently." *United States v. Castorena-Jaime*, 117 F. Supp. 2d 1161, 1171 (D. Kan. 2000); *see also United States v. Garcia-Escalera*, 998 F. Supp. 2d 1191 (N.D. Okla. 2014); *United States v. Al Saimari*, 982 F. Supp. 2d 1285, 1292 (D. Utah 2013).

Considering the totality of the circumstances, the Court finds that Defendant knowingly and intelligently waived his *Miranda* rights. First and importantly, the Court has found that Defendant adequately understood the *Miranda* rights recited to him in English, as detailed above. Second, SA Wright recited the *Miranda* warning verbatim from the Advice of Rights form, which makes the warning itself adequate. Additionally, the Court credits SA Wright's testimony that he interpreted Defendant's responses as affirmations of understanding. Specifically, SA Wright testified that he understood "Oh" as an affirmation and not as a question. Tr. at 68:1. He testified this was because "[i]n Navajo, 'oh' also means yes, so it could be interpreted that way. I interpreted that he understood my statement that I was saying to him." *Id.* at 68:11–13. The conclusion that Defendant's interjection "uh-huh," Ex. 1A at 7:16, was a confirmation and not a question is also supported by SA Wright's point that Defendant said it in the middle of a sentence and not in response to a question.[7] Tr. at 62:24–63:2. Furthermore, SA Wright explained to Defendant

---

[7]      SA WRIGHT: And so we want to go over that. Now, before we talk to you, we always like to go over --- I don't know if you watch TV or movies. We always go over advice of rights and things --
         MR. BENALLY:  Uh-huh.
         SA WRIGHT: -- just to make sure you understand what those things are. And if you have any questions, feel free to ask them to me, too. Do you read -- do you read English well?

multiple times that he could stop speaking to the agents if he wished.[8] When Defendant asked, "you said I have to have a lawyer first?", SA Wright responded,

> No. So this—this is saying that—that if you're willing to talk to us right now, like, without a lawyer sitting here in the car, that you'd be willing just to talk to us right now—and that at any time if you feel, you know, uncomfortable and don't want to keep talking about anything, then you can say so.

Tr. 10:15–25. Notably, Defendant interjected "oh" into SA Wright's response to that question. Looking at his response, SA Wright rephrased his explanation to be colloquial and he did not use technical legal phrases. Defendant indicated that he understood SA Wright's explanation with "oh," which the Court credits as an affirmation based on SA Wright's testimony. SA Wright asked twice if the advisement made sense (Ex. 1A at 9:16–17, 12:1), and after the second time, Defendant responded with "yeah." Ex. 1A at 11:2. SA Wright testified that he did the following to ensure that Defendant understood his rights:

> I read the rights out loud to him. I asked if he had any questions. He brought up the question about the last right. We talked about it for a moment. I asked him a couple of times if he understood, and as we pointed out through our conversation now, he said, "Oh, oh, okay," and did not bring up any other questions during that time.

Tr. at 71:24–72:6. This was adequate, and Defendant did not express any other misunderstanding or have any further questions about his *Miranda* rights. Regarding Defendant's demeanor, SA Wright's testimony is credible that Defendant was calm and cooperative, and the recording supports this determination based on the level intonation in Defendant's voice during the interrogation. Finally, this conclusion is supported by the fact that Defendant signed the form,

---

[8] SA Wright told Defendant that he could "stop answering at any time" (Tr. at 9:13–14), and the agent explained that "it's just a voluntary statement from you" (Tr. at 9:24–25). SA Wright also stated "So at any time, if you're like, Hey, I don't you know—I don't want to talk anymore, you—then all you've got to do is say so." Tr. at 10:1–3. He also told Defendant "you have the right at any time to say, Hey like yeah, that's—you know, I'm—I'm good talking now." Tr. at 10:5–8.

which the recording reflects SA Wright explained to Defendant and read to him verbatim. Ex. 1A at 10:9–14, 11:1–9.

Based on the recorded conversation between SA Wright and Defendant about the *Miranda* rights, and considering SA Wright's testimony, the record shows that Defendant had "the requisite level of comprehension" for his *Miranda* waiver to be valid. *Toro-Pelaez*, 107 F.3d at 825. The *Miranda* warning delivered to Defendant was "was sufficient to apprise him 'both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) (citing *Moran*, 475 U.S. at 421).

Finally, the Court rejects Defendant's argument that he should have been Mirandized prior to the biographical questions. Tenth Circuit law provides that "routine booking questions do not constitute interrogation because they do not normally elicit incriminating responses." *United States v. Parra,* 2 F.3d 1058, 1068 (10th Cir. 1993); *see United States v. Lara-Garcia*, 478 F.3d 1231, 1235 (10th Cir. 2007) ("To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." (quoting *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 189 (2004))). There is no evidence that SA Wright's initial biographical questions were intended to elicit an incriminating response based on SA Wright's testimony that he used these questions to assess whether there was an "impediment," including a language barrier, to conducting the interrogation. SA Wright's testimony that he used these questions as an assessment is credible and reasonable. The Court also credits SA Wright's testimony that "I asked him for just his biographical information to identify who he is. That way I can ensure that I'm talking to the person that I want to be talking with and know who that person is." Tr. at 43:24–44:2. Defendant did not make any incriminating statements prior to being Mirandized and the questions were not constructed to elicit incriminating responses because they were basic biographical questions.

**CONCLUSION**

This Court finds that the evidence and testimony in the record supports the determination that Defendant possessed an adequate comprehension of English to understand the *Miranda* warning delivered to him in English by SA Wright. The United States has carried its burden by a preponderance of the evidence to show that Defendant knowingly and intelligently waived his *Miranda* rights, and thus his *Miranda* waiver is valid. Accordingly, for the reasons stated in this Memorandum Opinion and Order, *Defendant Darren Benally's Motion to Suppress Custodial Statements to Law Enforcement and Memorandum in Support* (**Doc. 32**, filed 8/23/18) is **DENIED**.

**IT IS SO ORDERED.**

_____
CHIEF UNITED STATES DISTRICT JUDGE