IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                  No: 18-CR-2429-WJ

DARREN BENALLY,

      Defendant.

## DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT (DOC. 218)

**COMES NOW**, Darren Benally, by and through his attorney of record, Amy Sirignano, of the Law Office of Amy Sirignano, PC, and makes the following objections to the Presentence Report ("PSR") (Doc. 218).

## OBJECTIONS

**PSR First Page.** Ms. Ann McCollum is no longer co-counsel for Mr. Benally.

**PSR ¶ 1.** The PSR should notate that initially, the government filed a Criminal Complaint (Doc. 1, 18-MJ-1097) for Second-Degree Murder in Indian Country on April 5, 2018. An Indictment also charging Second Degree Murder in Indian Country (Doc. 26) was filed on July 27, 2018.   Mr. Benally's case proceeded to trial from Monday, June 24, 2019 through Friday June 29, 2019, (Docs. 196, 200, 201, 202, 203, 204, 205).  The jury deadlocked and could not come to a unanimous verdict on Second Degree Murder and

the lesser included offenses of Voluntary Manslaughter and Involuntary Manslaughter (Doc. 197).  Post-trial, on July 22, 2019, the parties agreed to a plea agreement and a 1-count Information to Involuntary Manslaughter (Docs. 211, 212, 213, 214, 215).

**PSR ¶ 6.**  Please see paragraph 17 of the Plea Agreement (Doc. 214), which accurately reflects what appellate rights were waived by Mr. Benally.

**PSR ¶ 8.**  Mr. Benally did very well with completing his mental health assessment and individual counseling.  Mr. Benally was in compliance with the rules of the La Pasada Halfway House from April 9, 2018 – through late September 2018.  On or about October 25, 2018, Mr. Benally came to Counsel's Office because he wanted to report to his attorney that he was being treated unfairly at the La Pasada Halfway House by other inmates, staff and his counselor.

During the seven (7) months he resided at the halfway house, in addition to the mandatory counseling (and other Court-imposed conditions of release) he was working, and riding his bicycle to get to work.

Mr. Benally has never was in a custodial setting and may have been treated differently than other defendants at the Halfway House.  Because he did not have another third-party custodian, and U.S. Probation would not allow him to return to his homestead on the Navajo Reservation, he was ordered detained on October 31, 2018.  Mr Benally has approximately 371 days in custody (through October 21, 2019).

**PSR ¶¶ 9-20.**  The U.S. Probation Officer should not use the hearsay investigative reports prepared *solely* by the government (Navajo Police Department, the Federal Bureau of Investigation, and the Office of the Medical Examiner, from the United States' Attorney's Office files) as the Offense Conduct.  There was a trial in this matter, and that testimony was given under oath, by all the witnesses.  The government's and law enforcement reports are clearly biased towards their failed second-degree murder case.

The *complete and fair* facts of the events from March 27, 2018, should be derived from the 5-day trial transcripts (Docs. 200, 201, 202, 203, 204, 205).

The defense objects to the government-slanted and unfair description of the Offense Conduct in its entirely, paragraphs 9-20.  This clearly a self-defense case, despite U.S. Probation's *complete failure to mention* self-defense.

**PSR ¶ 10.**  N.T., the decedent is a relative of Mr. Benally.  This is a tragic case where the government sought prosecution of Mr. Benally despite the overwhelming evidence that N.T. started the fight with Mr. Benally (Bates USA v. Darren Benally 000319), that N.T. was a chronic alcoholic who didn't work, (*see* Exhibit EE, 12/31/12 emergency room report where N.T.'s blood was 497 mg/dl), and who used to start fights with Mr. Benally and other family members (Bates USA v. Darren Benally 000321-323).

Mr. Benally *strenuously* objects to U.S. Probation's unsupported conclusory statement that "N.T.'s death was caused by the defendant."  PSR ¶ 10.  N.T.'s ultimate

cause of death is disputed by the parties (Doc. 205, Trial Transcript 06/25/2019, pages

335-345).  While the Office of the Medical Examiner's (OMI) Report found that the cause

and manner of death as blunt force trauma, and homicide, respectively, the testimony

elicited at trial, by the government from Dr. Lauren Dvorsak, was not as exacting as to

specific "cause of death" as the government and U.S. Probation would like it to be:

> Q. (By AUSA Spindle) Did you notice anything strange about the decedent's heart?
> A. (By Dr. Lauren Dvorsak) So, he had a lot of natural disease in his heart. He had what are called coronary artery atheromas, or atherosclerosis, or hardening and narrowing of the arteries that supply the heart. Most significantly was his left anterior descending or the front of the heart. That particular artery was critically stenosed at 75%.
> Q. Is that unusual?
> A. That's indicative of advanced heart disease.
> Q. So is it unusual in someone that is the decedent's age?
> A. It's advanced disease for somebody in their fifties to sixties, yes.
> Q. Do you think it would have caused his death alone?
> A. No, I don't think alone. It didn't necessarily cause his death in this case, because he was obviously up and walking around based on the history that was provided. So alone, no, I don't think it caused his death.
> Q. Did you receive any toxicology reports back regarding any alcohol in the decedent's blood?
> A. Yes.
> Q. And did the decedent have any alcohol in his blood?
> A. Yes.
> Q. And what does that indicate to you?
> A. So, the decedent, the toxicology reports indicated that in his blood at the time of his death, his blood alcohol concentration was approximately three times that of the legal driving limit almost, nearly. So he was intoxicated. What that means for him, I can't say exactly, because different people have different tolerances, and especially if he had been a chronic alcoholic, he could have developed a tolerance to the effects of alcohol. But in that same range, typically you're getting some decreased consciousness, a

> little slurring, a little impaired coordination, those sorts of things, typically.
> Q. The decedent's heart issues and intoxication at the time of his death, did you note those as any sort of contributory cause?
> A. Yes, I think both of those contributed to his death.

(Doc. 205, Trial Transcript 6/25/19, pages 334-335).  Both N.T.'s heard issues and

*intoxication* at the time of the fight contributed to N.T.'s own demise. *Id.*   Dr. Dvorsak

also explained post-concussive apnea.  (Doc. 205, Trial Transcript 6/25/19, pages 336-

337).

Furthermore, at trial, Dr. Dvorsak explained to defense counsel and the jury:

> Q. (By Ms. Sirignano) And you and your staff did a CAT scan of the body prior to external and internal examination?
> A. (By Dr. Dvorsak) Correct.
> Q. And in the CAT scan, there was no physical injury to the brain or no real skull fracture; isn't that true?
> A. There's only skull fractures in the sense of facial bones. So that's in the head. But the calvaria, the top part of the head, and the base of the skull, the portion that your brain sits on, there were no fractures there. Additionally, there was no evidence of bleeding in or around the brain. The only evidence of injury, say, to the brain, itself, was that cerebral edema.
> Q. And that's brain swelling?
> A. Yes.
> Q. And you testified that cerebral edema, or brain swelling, can be from lack of oxygen; correct?
> A. Yes.
> Q. And you testified that he stopped breathing; isn't that true?
> A. Yes. It's most likely the mechanism.
> Q. When you say it's the most likely mechanism, you found that the significant contributory factors of acute ethanol or

alcohol intoxication and cardiovascular disease was present in
[N.T.]; isn't that true?
A. Yes.
Q. And so can alcohol make the brain more susceptible to fatal injury?
A. Yes. So, when combined with blunt trauma, even if there is no necessarily acutely lethal injury inside the head, that concussion can cause that post-concussive apnea, or stopping breathing. But that's more likely to occur when you also have what's called a central nervous depressant on board, and that's
what alcohol is. It functions to essentially depress the brain centers that control breathing and it makes it more likely for somebody to stop breathing especially after blunt trauma.
Q. A concussion would not normally lead to someone's death except in the presence of this amount of alcohol?
A. Not typically. I mean, there's a wide spectrum of concussive injuries that can involve no loss of consciousness to some loss of conscious. There is rare reports in the literature that concussion alone can potentially be lethal. But in this case, I do believe the alcohol played a significant role.
Q. Typically a brain recovers from a concussion; isn't that true?
A. Most often, yes. But, again, concussions aren't typically lethal.
Q. So your testimony today is that [N.T.'s] brain didn't recover, and the significant contributory factor was the alcohol?
A. Correct.

(Doc. 205, Trial Transcript 6/25/19, pages 343-345).

    The significant contributory factor of N.T.s death was *his own voluntary intoxication*.

Dr. Dvorak opined, "the mechanism" of his death, was that N.T. stopped breathing.

(Doc. 205, Trial Transcript 6/25/19, pages 344, lines 10-12.

There was no bleeding around the brain, no cranial fractures from the fight. (*Id.*, Doc. 205, Trial Transcript 6/25/19, page 343, lines 23-25; page 344, lines 1-4).

**PSR ¶ 12.**  Deano Benally testified at trial.  His sworn testimony should be the evidence in the PSR regarding what transpired that evening.  He was the first witness to the scene. (Doc. 204, Trial Transcript 06/24/2019, page 187).

**PSR ¶ 13.**  The FBI and Navajo Nation Police did not speak to Mr. Benally in his native language, Navajo.  There is an entire transcript of the October 15, 2018 hearing on Mr. Benally's Motion to Suppress regarding what happened during the defendant's questioning by law enforcement. (Doc. 62, Transcript of October 15, 2018 hearing). Paragraph 13 is absolutely inconsistent with the witness' testimony.  *Id.*

**PSR ¶ 20.**  Probation's summary paragraph is also inconsistent with the pretrial and trial testimony.  *See* Mr. Benally's entire post-arrest statements to law enforcement officers.  (Doc. 38, Exhibit 1a).

N.T. was *not* taken to the ground by Mr. Benally. (Doc. 104, Government's Trial Exhibit 18,  and demonstrative transcript attached hereto, p. 80, lines 17-21)("Q: When he fell down, do you remember if he went face first, or did he go backward? Do you remember? A: um, yeah, sort of kind of, like sideways.")

Mr. Benally didn't *estimate that it was over twenty [hits/punches]*. (Doc. 104, Government's Trial Exhibit 18 and demonstrative transcript attached hereto, page 84, lines 2-25; page 85, line 1-15).

This "over twenty [hits punches]"is a fiction that the FBI Special Agent created when he continuously asked Mr. Benally leading questions in his non-native language. (Doc. 104, Government's Trial Exhibits 18 demonstrative transcript attached hereto, page 84, lines 19-23)(" Q: More than 10 [hits], more than 20? A: Yeah. Q: Okay. A: I don't know.  I got tired of it.  I just –"); Doc. 38, Exhibit 1a.  A more-accurate review of Mr. Benally's post-arrest statement to law enforcement (Doc. 38, Exhibit 1a), clearly provides that Mr. Benally stated that he did not know how many times he hit N.T.  – especially after he was lead by the Special Agent to agree with him *throughout* the entire post-arrest statement.

The record is absolutely replete of evidence that "Mr. Benally used his "full force to strike N.T." and "did not stop until N.T. stopped moving."  The evidence showed that Mr. Benally used sufficient force to defend himself, and that "when he stopped [punching], I stopped." (Doc. 104, Government's Trial Exhibits 18, and demonstrative transcript, page 85, lines 2-15); Bates USA v. Darren Benally 000376).

N.T. was already deceased when emergency personnel arrived on the scene.  (*See generally*, Doc. 204, page 212 – 228, trial testimony of Doreen Williams).

U.S. Probation did not discuss that Mr. Benally was acting in self-defense, which is absolutely improper. The government moved to exclude the defense of self-defense (Doc. 37, page 3), but it was denied (Docs. 156, 166, 192, 193, page 13, Jury Instruction No. 10).  During the pretrial hearing the Court conducted a review of the pre-trial

evidence and concluded that it supported a self-defense jury instruction.  (*See generally*, Doc. 176, Pretrial Conference Transcript 06/18/2019, pages 8 – 13, ).

> By Ms. Sirignano: First of all, alcoholism by the victim decedent
> played a major part in this instance. He was .27 or .29 postmortem. So we have a right to present evidence regarding my client's mens rea, and at the time this event happened, he knew that when the defendant -- excuse me; when the victim, the
> decedent, was drunk, he was violent, and he swung out and lashed at not only him, he carried a knife, he also did this with other members of the community. It goes directly to our defense of self-defense. And the Defendant had knowledge of that, and the whole community had knowledge of that.

(Doc. 176, Pretrial Conference Transcript 06/18/2019, pages 8, lines 4-13).s

**PSR ¶ 21.**  Defendant's version is contained in our Objections to the PSR, the defendant's Sentencing Memorandum, and in the defendant's Acceptance of Responsibility Statement, not just the facts of the Plea Agreement (Doc. 214).

**PSR ¶ 23.**  The death of N.T. affected his entire family, including the Benally family who lived next to N.T. for decades.  This victim impact statement devalues the entire family, as it is very one-sided.   No one from the Benally family was interviewed for their victim impact statement.  N.T. was related to Darrell Benally, Deano Benally, and others, whose victim impact interviews were not sought.

Moreover, defense Counsel was not provided a copy of the family statements by C.T. and T.T.  Very respectfully, Counsel requests reports and/or notes of interviews with C.T. and T.T. forthwith.

Throughout the duration of the case, T.T. has been known to have been very emotional and caused additional distress (involving the Navajo Nation Police) the night of N.T.'s death.  (Doc. 176, Pretrial Conference Transcript 06/18/2019, pages 129-132).

Additionally, police officer Lojan Dennison notated in her reports that T.T. was "hysterical" (Bates USA v. Darren Benally 016).

During Mr. Benally's trial, the CSO's were aware of the family dynamics and during every courtroom break, they kept the families apart.  The aggressive nature of T.T. and her family provoked the daily trial stress for everyone.

At sentencing, one of Mr. Benally's family members will testify, that prior to trial, T.T. and her family created a scene at N.T.'s funeral.  During trial, T.T. and her family sneered at them, were aggressive towards them, and spoke badly to them (mostly in Navajo so the CSOs and others did not know what they were saying), specifically, to Mr. Darrell Benally, Kathleen Benally, Deano Benally, and Doreen Williams.  The aforementioned Benally's are also direct victims in this unfortunate incident, and under the law, should be treated accordingly.

T.T.'s *extremely limited* rebuttal testimony at trial (Doc. 205, Trial Transcript 06/25/2019, pages 438-439) did not provide any evidence, other than she was related to N.T. and she saw him the Friday before he died and he had no visible injuries.  *Id.*  T.T. has been trying to get a platform for her complaints for many, many months, and her veracity is questionable.

For example T.T. created the wedge between the families – running into the Benally house looking for Darren the night he was arrested and being absolutely chaotic and unpredictable since her Uncle's death.  (Bates USA v. Darren Benally 016).

T.T. was a subject to a defense objection (Doc. 147) so her emotional testimony would not sway the jury – she had no first-hand knowledge of the incident. (Docs. 171, 187).  The Court ruled she did not have first-hand knowledge of the incident, her testimony would be cumulative, and irrelevant.

Ironically, Counsel was contacted by Ms. Carol Smith on October 8, 2019.  She advised that N.T.'s mother, R.T. passed away.  N.T.'s mother's family would like the Benally family to attend the services and functions for R.T.  Neither the defendant, or his entire family are responsible for the "wedge" that exists among family members.

**PSR ¶ 24-28.**  It is curious why T.T. spoke of Mr. Benally getting a time-served sentence, and her opinion that, Mr. Benally, "can do whatever he wants with minimal consequences."  PSR ¶ 27.  The U.S. Probation Officer did not write about whether he spoke to T.T about N.T.'s chronic alcoholism, whether he worked a gainful employment, how many years' he hadn't worked because he was an alcholic, whether N.T. *really* took care of his mother (disputed by other family members), and whether the decedent was a "kind-hearted" man who helped everyone, and had many friends.  The evidence has shown, and will show at sentencing that T.T.'s version of the facts are her bias version and not based on the facts.

In paragraph 27, Counsel for Mr. Benally strenuously contests that Mr. Benally "chose to engage with N.T." T.T. was not there when N.T. walked from his house to the Benally property, and trespassed on the Benally property to *intentionally* pick a fight with Mr. Benally. (Bates USA v. Darren Benally 016, 316-321). T.T. was not there when N.T. started cussing at Mr. Benally *Id.* T.T. was not there when N.T. first swung at Mr. Benally. *Id.* T.T. was not there to see N.T. so intoxicated, and that his brain chose to stop breathing. (Doc. 205, pages 343-345). Mr. Benally did NOT chose to engage with N.T. – rather, he had no choice. *See* Government Trial Exhibits 18, demonstrative exhibit, page 79, lines 16-19). N.T. started the fight with him. *Id.*

These facts were proven at trial. (*See* Government Trial Exhibits 18, 19, demonstrative transcripts attached hereto). Mr. Benally only reacted to N.T.'s first aggressive behavior. *Id.* Mr. Benally "he stopped [fighting] and then I stopped." *See* Government Trial Exhibit 18, demonstrative transcript, page 85, lines 10-15, attached hereto).

**PSR ¶ 28.** Counsel for Mr. Benally acknowledges that the Mandatory Victim's Restitution Act applies in this case. 18 U.S.C. Section 3663A. However, many of the alleged expenses claimed by the decedent's family do not fall within the mandatory restitution category. Counsel for Mr. Benally respectfully requests a copy of all receipts that U.S. Probation has collected forthwith for restitution.

Counsel for Mr. Benally objects to any restitution that does not directly relate to N.T.'s burial and interment.  The Mandatory Victim's Restitution Act does not cover discretionary family expenses.  See 18 U.S.C.S. § 3663A.

Counsel very respectfully objects to the following expenses listed in paragraph 28 for Funeral/cutlery $5.33; Funeral/attire $6.00; Funeral/food $48.78; Funeral/flowers $105.29; Funeral/sewing $2.13; Fuel/court (multiple dates from April 9, 2019 through October 21, 2019) $1,055.60; (by whom and why) and Lost wages/court $470.00 (by whom and why) for a total restitution amount of $2,723.42.  Counsel for the defense demands receipts of these alleged expenses and need to question everything other than the funeral costs.

U.S. Probation Officer Jason A. Hunt spoke to multiple members of the Benally family and conducted a home visit of their homestead post-plea hearing.  Remarkably, and regrettably, his PSR to the Court reflect only his interviews with other family members.

**PSR ¶¶ 31-40.**  Counsel for Mr. Benally very respectfully objects to the offense level computation in paragraphs 30-40.

Throughout this process, Counsel and U.S. Probation spoke in-person, telephonically, and via email about Mr. Benally's conduct.  Mr. Hunt's initial opinion was that Mr. Benally's conduct was criminally negiglent, or at an offense level 12, and

13

he was facing a time-served sentence, or level 12, ten (10) to sixteen (16) months'

imprisonment.

After Mr. Hunt spoke to the government, his opinon changed.  The fact remains,

Mr. Hunt's initial review of the evidence – while he interviewed and spoke to Mr.

Benally and defense counsel is *completely different* than what he told me and Mr. Benally

at the time of the PSR interview.

**PSR ¶ 31.**  The correct base offense level is 12, not 18.  Mr. Benally's conduct was

criminally negligent, not reckless.

Criminally negligent "means conduct that involves a gross deviation from the

standard of care that a reasonable person would exercise under the circumstances, but

which is not reckless.  Offenses with this characteristic usually will be encountered as

assimilative crimes." U.S.S.G. § 2A1.4, Application Notes, Definitions, paragraph 1;

*United States v. McHugh*, 122 F.3d 153, 156-157 (2nd Cir. 1997)(discussion of awareness

for reckless standard and gross deviation of standard of care for criminally negligent

standard).

Reckless "means a situation in which the defendant *was aware of* the risk created

by his conduct and the risk was of such a nature and degree that to disregard that risk

constituted a gross deviation from the standard of care that a reasonable person would

exercise in such a situation." (emphasis added). "Reckless" includes all, or nearly all,

convictions for involuntary manslaughter under 18 U.S.C. § 1112.  A homicide resulting

from driving a means of transportation, or similarly dangerous actions, while under the

influence of alcohol or drugs ordinarily should be treated as reckless.  U.S.S.G. § 2A1.4,

Application Notes, Definitions, paragraph 1; *United States v. Naghani*, 361 F.3d 1255,

1263 (9th  Cir. 2004)("To the extent Naghani raises his intoxication as a challenge to the

district court's finding of recklessness, that claim is rejected. Naghani had been involved

in previous drunk-driving incidents and admitted that he was 'afraid to fly,' had 'a

tendency to become garrulous under the influence of alcohol' and sometimes lost

control of his actions when intoxicated. Naghani therefore should have known that 'the

combination of intoxication and air travel could lead to dangerous consequences.' *Citing*

*United States v. Jenny*, 7 F.3d 953, 957 (10th Cir. 1993)(holding that the defendant had the

'foreknowledge' required of recklessness).

Mr. Benally's conduct was not reckless.  His behavior does not come close to the

behaviors of defendants McHue and Naghani.  He was neither in an automobile, and

was *not under the influence of alcohol or drugs*.  He was minding his own business and was

cleaning up in the yard when he was swung at by his uncle.  He used only the force

necessary to stop his uncle from fighting with him. (Exhibit 18 demonstrative, page 85,

lines 2-15.  He used no more force than necessary than to stop the fight.  *Id*. There is no

evidence to show that Mr. Benally was "aware of the risk" to defend himself after N.T.

started a fight with him, and that N.T. would stop breathing after he was hit.

U.S. Probation merely offers a conclusion in paragraph 31, without any factual or legal basis.

**PSR ¶ 48.**  Mr. Benally was sensely attacked and he requested to move out of the detention pod for his safety. The other detainee fought with Mr. Benally.  Mr. Benally was seen by the medical staff at Cibola County for injuries he sustained.

Mr. Benally has been misunderstood and has been jumped, at least twice by other inmates at the Cibola County Detention Center.  Defense Counsel strenuously objects to U.S. Probation's summary of his experiences in custody.  If needed, Counsel will subpoena the Correctional Officers to testify on Mr. Benally's behalf that he was not the aggressor during these incidents.  U.S. Probation's conclusions about these incidents are simply untrue, and could be corroborated by Cibola's medical file and detention records.

Defense Counsel has been requesting the Cibola County Detention Center why her client is in segregation, and will attempt to have all the relevant records prior to sentencing.

**PSR ¶ 49.**  This matter is not pending in federal Court.  Per the plea agreement in this case (and accepted by Judge Parker), the matter will be dismissed upon sentencing. This case is the same case from ¶ , revived by the federal prosecutors and brought to federal court as *United States v. Darren Benally,*  19-CR-1155-JAP.

**PSR ¶¶ 50, 51, 52, 53, 54.**  These alleged arrests were all dismissed or not charged by the Shiprock Police Department.  The government can affirm to Mr. Benally being arrested by the Shiprock Police Department, and there was no subsequent prosecution.  (Doc. 18, page 2, FN 2). If U.S. Probation Officer Hunt knows anything differently, then he immediately needs to produce his records (and his unknown disposition records) to all parties.  If the parties can get a disposition of these arrests - so should U.S. Probation for Mr. Benally's official PSR.

In PSR ¶ 52, Counsel strenuously objects to the conclusory factual finding that Mr. Benally that "Casino security found Mr. Benally standing over Ms. Woods and punching her with closed fists."  Counsel reviewed the video from August 27, 2017, and the video does not corroborate these allegations. U.S. Probation's description of the events from August 15, 2017 is absolutely uncorroborated and only come from his ex-girlfriend, Brenda Woods.

Ms. Woods did not want to be a part of the federal court process, based on Counsel's discussion with SAUSA Kyle Nyback.  She started the fight with Mr. Benally and she refuses to be cross-examined about the events on August 15, 2017.

**PSR ¶ 56.**  Mr. Benally's father is named DARRELL Benally. It is notable that the U.S. Probation Officer did not take the time to accurately notate the defendants' father's name.   Mr. Darrell Benally is having tests run for a possible cancer diagnosis.  He was in the hospital for approximately 2 days this month, October 2019.

PSR ¶ 57.  U.S. P.O. Officer Jason A. Hunt never spoke to Mr. Benally's family about the devastation that this event created on the family.  There is no information from Mr. Benally's mother, father, Uncle Deano, Aunts and Cousins about the impact that was felt by Mr. Benally's family --- since the decedent was an Uncle to the defendant.  The statement, "[t]he conduct in the instant offense created quite a wedge in the defendant's family," is unsupported by the facts.  Mr. Benally's family *wholeheartedly supports him* because they know the true facts about N.T.'s severe and chronic alcoholism and abusive behavior.  The "wedge" was created by T.T. and others in N.T.'s family.  Mr. Benally's family paid their respects honorably and was violently attacked, ridiculed outside and inside of court, and has been bad-mouthed in the community and in the local newspapers.

PSR ¶ 60.  N.T. and his family no longer reside in Santostee, NM.  His mother, C.T. and T.T. both live in Farmington, NM, and the house is vacant.  There also is a pending legal issue about whether they remain to qualify to have the homesite lease.

PSR ¶ 63.  Mr. Benally was fully compliant with all his counseling and enjoyed going to counseling.

PSR ¶ 72.  The total offense level should be 12.

PSR ¶¶ 79-82.  Mr. Benally is indigent and cannot afford a fine.

**PSR ¶ 83.**  The defense agrees that the Mandatory Victims Restitution Act applies in this case, but contests the amount of restitution.  *See* objections to PSR ¶ 28, above.

**PSR ¶ 87.**  The information regarding bullying by N.T., and that Mr. Benally acted in self-defense can be corroborated by the government's trialExhibits 18, 19, demonstrative trial transcripts, his own post-arrest statement to law enforcement (Doc. 38, Exhibit 1a), and other family members, Deano Benally, Darrell Benally, Katherine Benally, Carol Smith, and others.

**PSR ¶ 88**.  Mr. Benally didn't "apologize" to the FBI Agents about what happened.  The specific statements are contained in government's trial Exhibit 19:

> Q: (By SA Wright):  Sometimes when stuff like this happens, you know, and I know it just happened so it's still kind of fresh in your mind.  But If, you know – if –some people like to have a chance to just, you know, say they're sorry for what had happened, or you know, for what they did.
> A: (By Mr. Benally):  Oh, okay,
>  . . .
> Q: Yep. Time to be done with it.
> A: Yeah.  And I would just tell them, you know, "Sorry" just – it was him (sic) bothering me.

Trial Exhibit 19, demonstrable, page 92, lines 18-23; page 94, lines 9-12.

Again, the trial transcripts and interviews with Mr. Benally's family will corroborate that N.T. bullied Mr. Benally (and other family members) for many years.

Mr. Benally has has prior tribal *arrests*, not cases, and these cases were not pursued or dimissed.  *See* objections to PSR ¶¶ 50, 51, 52, 53, 54, above.

Case 19-CR-1155-JAP will be dismissed at sentencing in this matter.

Counsel again objects to the offense level of 15.

Counsel will be filing a sentencing memorandum forthwith.  This case will proceed to sentencing on October 21, 2019.  It will not be continued by defense counsel. However, Mr. Benally's PSR and objections should be immediately revisited by a more senior officer, and an immediate Addendum must be filed prior to sentencing with the defendants' family interviewed for both the alleged factual basis, the victim statement, and the personal and family data.  This is a *self-defense case* which also needs to be addressed in the PSR.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Benally respectfully requests that the Court accept his PSR objections, and his PSR be revised to reflect the above.

Respectfully submitted,

 */s/ Electronically Filed*
Amy Sirignano, Esq.
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE #250
Albuquerque, NM  87109
(505) 242-2770
(505) 242-2774 facsimile
amy@abqnmlaw.com

*Counsel for Darren Benally*

20

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system to opposing counsel, and to U.S. Probation this 10th day of October, 2019.

 */s/ Electronically Filed*
Amy Sirignano, Esq.