# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                  Case No.: 18-CR-2429-WJ

DARREN BENALLY,

     Defendant.

## **DEFENDANT'S SENTENCING MEMORANDUM**

COMES NOW, defendant Darren Benally, through appointed counsel Amy Sirignano, Esq., of the Law Office of Amy Sirignano, P.C., and pursuant to the United States Constitution Amendments V and VI, and 18 U.S.C. § 3553(a), moves this Court to sentence Mr. Benally to a sentence of time-served imprisonment, with credit for approximately 371 days, imprisonment (from October 30, 2018 through October 21, 2019, or 12.18 months), followed by a term of 3 (three) years supervised release.  This sentence is sufficient, but not greater than necessary, to comply with the purposes of federal sentencing.  In support of his sentencing request, Mr. Benally states the following:

I.      <u>BACKGROUND</u>

Darren is a life-long resident of Sanostee, NM.  PSR, ¶ 56. He is a Native

American, and a member of the Navajo tribe.  PSR, p. 3.  He lives with his mother and

father on the reservation in Sanostee, NM.  PSR, ¶ 56.

Darren did his very best in middle school, and in high school.  During that time,

he was awarded many academic certificates.  *See* Exhibits I, J, L, M, N, O.  He received

his high school diploma on May 21, 2011.  Exhibit P.  He also received an award for his

knowledge of the Navajo language – his first language, that he is fluent in.  Exhibit K.

Darren was involved in many sports in school, (cross county, volleyball, basketball,

etc.), and received a certificate for athleticism in 2002.  Exhibit H.

Darren is a very, very hard worker.  He went directly from high school to

welding school at the San Juan County Community College.  While he had difficulty

with the many subjects, he persisted, and after a few years, obtained his welding

certificates.  *See* Exhibits Q, R, S, T, U.

Darren enjoys welding and his job very much.  Every work day, he traveled

approximately 1.5 hours one-way, to his job.  His prior employer advised at Darren's

arrest, and recently, that Darren is eligible for rehire.

His co-worker, Bob Sandoval, also provided a letter to the Court for Darren's

sentencing.  Exhibit F.  Mr. Sandoval characterizes Darren as a very friendly, and a

flexible worker.  Darren is willing to give help when a co-worker is in need.  Mr.

Sandoval states that Darren gets along with his co-corkers.  *Id*.  Mr. Sandoval also states that Darren was progressing in his welding skills on the job.  *Id.*

Darren is very, very close to his family.  His family and Pastor provided many letters to the Court to learn about the *real* Darren Benally.  *See* Exhibits A, B, C, D, E, G. Notably, Pastor Jack states that Darren has been attending his church for the last 10 years, and he's not seen any violence, bitterness, or hatred in him.  Exhibit D.  Pastor Jack also notes, upon Darren's release he will counsel and support him in prayer and through the Living Word of God.  *Id.*

Darren's family also provided many photographs of Darren with his extended family.  *See* Exhibits V (graduation with parents), W (BBQ with parents), X (with grandfather), Y (BBQ with parents), Z (with cousin), AA (with father), BB, CC, DD (with family).

Darren's mother has not been well for many years, and she suffers from arthritis and bad vision.  PSR, ¶ 56.  Darren's father was recently hospitalized and was diagnosed with throat cancer.  His father usually works away from the home, most recently in Arizona.  Before his arrest, Darren did everything for his mother, (laundry, grocery shopping, rides to medical appointments, etc.) PSR, ¶ 56.  Darren also helped his parents financially by paying for food, utilities, propane, and other household expenses.  *Id.*

Darren does not drink alcohol or use drugs. PSR, ¶ 64.  He is unlike many Native American clients that this Court has sentenced.  Darren was not intoxicated or under any influence of drugs during the incident on March 27, 2018.  Doc. 28, Exhibit 1a, pages 96-97.  He has a model son, and very responsible adult.  He takes care of his parents and family, commutes to Farmington to work, and works long days.  When he returns home, he helps his mother prepare dinner and then takes care of his parents' homestead.

Darren described himself to U.S. Probation as a hard worker – he'd wake up around 3:00 am to leave the house at 5:00 am to travel from Sanostee, NM to Farmington, NM for work every day.  PSR, ¶ 59.  He'd work a full day and come home to take care of his mother.

When released, Darren plans on getting his job back welding, and he would like to work on getting his Commercial Drivers License (CDL). PSR, ¶ 59.

Darren has accepted responsibility the incident, and is very sorry about his Uncle's death.  PSR, ¶ 59.  "It was *never his intention* to harm N.T.," *Id.*  Darren reacted to N.T. who "was belligerent, intoxicated and attacking" [him.] *Id.*

Darren's entire family, as victims to this unfortunate death, (the Benally family is *immediate* family with N.T), and in proximity, lived closest to N.T.  Darren's family members will testify that Darren's Uncle, N.T., would bully not only Darren, but other family members, and the community.  N.T. would routinely leave his house (after

4

drinking profusely) and become extremely combative and insulting to Darren, Darrell Benally, Deano Benally, other family members, and the community.  The witnesses will also testify that the Benally family often took care of N.T. (since T.T. was living in Farmington), and they would routinely check on N.T. and his elderly mother next door.

It is tragic that the Benally family was not identified by the victim advocate as victims, or "those [family members] closest to the victim [that] have been affected by the crime]." Addendum to the PSR (Doc. 223), p.5, Response #5.   The Benally family has the right to have their thought and feeling heard also.  The Benally family lived next to N.T. and his recently deceased mother, most of their lives.  Recently, N.T.'s family asked the Benally family to attend N.T.'s mother's funeral, and requested they donate to her funeral expenses.

The witness testimony at sentencing will show that N.T. did not work, and usually drank all day.  The family will also testify that N.T. had a prior head injury from a fight N.T. started with another individual.

Moreover, Darrell, Deano, and Darren Benally took N.T. in the back of their pickup truck to the emergency room (a few years ago) after N.T. drank household disinfectant/cleanser, and was on his deathbed.

Deano Benally will testify that N.T. was a tormented alcoholic soul, (Exhibit EE) who often sent him disturbing texts after drinking all day.  For example, Deano Benally

provided N.T.'s text messages about Satan and Lucifer, and wanting to borrow Deano's

.45 pistol, stating, "take care brother man."  *See* Exhibits FF, GG.

Darren does not seek to minimize him actions, and has only told the truth from

the day he was arrested.  Darren was attacked by N.T., and this unfortunate death

occurred.

A.      **The Statutory Framework of Federal Sentencing After United States v.
        Booker, 543 U.S. 220 (2005)**.

18 U.S.C. § 3553(a) requires the Court to impose a sentence sufficient, but not

greater than necessary, to comply with the purposes of federal sentencing, and imposes

a statutory duty to consider:

> **(1)** the nature and circumstances of the offense and the history and
> characteristics of the defendant;
> **(2)** the [purposes of criminal punishment];
> **(3)** the kinds of sentences available;
> **(4)** the kinds of sentence and the sentencing range [available];
> **(5)** any pertinent policy statement [by the Sentencing Commission];
> **(6)** the need to avoid unwarranted sentence disparities among defendants
> with similar records who have been found guilty of similar conduct; and
> **(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553 (2006).  A district court's duty in sentencing is to impose a sentence in

conformity with the parsimony principle in Section 3553.  *See United States v. Smart*, 518

F.3d 800, 811 (10th Cir. 2008) ("[D]istrict Courts are bound to 'impose a sentence

sufficient, but not greater than necessary' to comply with [the sentencing factors in

Section 3553(a)(2)].").  The purposes of federal sentencing enumerated in 18 U.S.C. §

3553(a)(2) are the need for the sentence imposed:

> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> **(B)** to afford adequate deterrence to criminal conduct;
> **(C)** to protect the public from furthim crimes of the defendant; and
> **(D)** to provide the defendant with needed educational or vocational training, medical care, or othim correctional treatment in the most effective manner;

18 U.S.C. § 3553 (2006); *see United States v. Booker*, 543 U.S. 220 (2005); *United States v. Kristl*, 437 F.3d 1050 (10th Cir. 2006); *United States v. Sanchez-Juarez*, 446 F.3d 1109 (10th Cir. 2006).

In *Rita v. United States*, 551 U.S. 338 (2007), the Court permitted, but did not require, appellate courts to apply a presumption of reasonableness to a sentence within the advisory guideline sentencing range.  *Rita*, 551 U.S. at 347-348.  The *Rita* Court also clarified that it was improper for a district Court to presume that the sentencing range as calculated under the Guidelines was reasonable.  *Id*.  Left unanswered by *Rita*, however, was how appellate courts were to review out-of-guidelines sentences.

In *Gall v. United States*, 552 U.S. 38 (2007), the Court clarified that federal sentencing should proceed in four basic steps: (1) Guidelines calculation, (2) Section 3553(a) analysis, (3) extent of variance from advisory sentencing range if an out-of-guidelines sentence is appropriate, and (4) justification for the out-of-guidelines sentence to afford meaningful appellate review.  *Gall*, 552 U.S. at 47-49.

**B.**   **A Sentence of Time Served, followed by a Three (3) Year Term of Supervised Release Would Best Satisfy the Goals of 18 U.S.C. Section 3553(a)**.

Darren has been in custody for approximately 371 days (or just over 12.18 months).  Mr. Benally's objections to the PSR (Doc. 221) support the defense's conclusion that a time-served sentence is within the base offense level for the offense involving criminally negligent conduct (offense level 12) and a two-level reduction for acceptance of responsibility, for a total offense level of 10.  *See* Doc. 221.  A total offense level of 10, criminal history category I, supports a guideline sentence of 6-12 months.

1.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.

a)   Nature and Circumstances of the Offense.

Without minimizing his conduct, Mr. Benally and his family have suffered significantly since March 2018.  The Court heard the nature and circumstances of the offense of conviction, involuntary manslaughter, during the trial from Monday June 24, 2019 through Friday June 29, 2019.  The pretrial hearing and trial transcripts are located in the docket as Docs. 196, 200-205.  This is the sworn evidence, under penalty of perjury that was presented to the jury.  U.S. Probation should be using to determine the Offense Conduct (Conduct of Conviction) in Mr. Benally's Presentence Report.

b)   History and Characteristics of the Defendant.

Mr. Benally is a devoted caregiver to his mother, his father, and his extended family.  As described above, he is very hard-working and understands the importance

8

of working hard, religion, and taking care of his elders.  While he has been arrested previously, he does not have any criminal convictions.

During the pendency of this case, Mr. Benally has been a victim of jailhouse violence in which he was injured and placed in segregation.  Counsel is obtaining Mr. Benally's medical records from Cibola County Detention Center to provide further information to the Court.

The instant offense is not a reflection of Darren's character.   He and the family will tell the Court that he was tormented and attacked by his alcoholic and abusive Uncle, N.T.  Mr. Benally did not mean to kill his Uncle.  Despite the government's claims that he did not show remorse, during his interview with law enforcement, he did tear up and cry over the incident and his Uncle's death.   "Q: You've been through a lot, you know.  I can see as you're just sitting here thinking about it, you know – A: Yeah; Q:  -- *kind of tearing up a little bit* –A: Yeah.  *See* Doc. 38, Exhibit 1a, page 95-96 (emphasis added).

When N.T. stopped fighting with Darren, Darren stopped fighting. *See* Doc. 221, Exhibit A, page 10.  Notably, Darren told law enforcement officers on the night of the incident that his Uncle used to be a good Uncle with him, until Darren entered high school.  Then N.T. was abusive towards him and pressured him to drink with him:

> MR. BENALLY:  Yeah.  He -- he used to be okay.
> SA WRIGHT:  Yeah?
> MR. BENALLY:  Yeah.  He's always acting up.

SA WRIGHT:  Back in -- back a long time ago,
he used to be all right, huh?
MR. BENALLY:  Yeah.
SA WRIGHT:  Yeah.
MR. BENALLY:  When I was in elementary and
middle school, we used to --
SA WRIGHT:  Yeah.
MR. BENALLY:  -- be normal and neutral and
talk, and we were good.
SA WRIGHT:  A good uncle?
MR. BENALLY:  Yeah.  *After high school, when
I got into high school, he started to change towards me.*
SA WRIGHT:  Yeah.
MR. BENALLY:  "How come you don't drink?
How come you don't  do this?"  I was like --
SA WRIGHT:  Yeah.
MR. BENALLY:  -- "*I don't want to.  I
already know how it is by looking at you what you're
going through.*"  I told him that.
SA WRIGHT:  Yeah.  You didn't want -- you
didn't want to be there, did you?
MR. BENALLY:  Yeah.  Like, he's all, "Well,
fuck you, then."  I was like, "You, too."  [INAUDIBLE]
all these things.
SA WRIGHT:  Yep.
MR. BENALLY:  And then he starts pissing me
off, *and I just walked off.*
SA WRIGHT:  That's that.
MR. BENALLY:  Yeah.  I just start walking,
*and he come back and* --
 SA WRIGHT:  Did you -- did you have anything
to drink today?
MR. BENALLY:  No.
SA WRIGHT:  Okay.  Not -- you taking any
medication or anything?
MR. BENALLY:  No.

*See* Doc. 38, Exhibit 1a, pages 96-97 (emphasis added).

Darren *walked away* from his Uncle to avoid the fight.  *Id.* at page 97, line 12.  The Court will hear first-hand from Darren's family how N.T. was abusive to all of them.

Upon his release, Mr. Benally will immediately start working, which is very important at this time.  His mother continues to be unwell and his father was recently diagnosed with throat cancer.  Mr. Benally needs to return to his family home to support his father and mother.  He has significant extensive family support, and the argument that N.T.'s family still possesses the property next to the Benally homestead is just a poor excuse to keep Darren estranged from his family.  The Benally witnesses with testify that none of N.T.'s family has been living in the house since the incident.

N.T.'s mother died very recently and N.T.'s family asked Deano Benally and other Benally family members to come to her services and contribute to her burial.  Any wedge in the family has been created by T.T., not Darren or his immediate family.  Darren will do very well upon release since this charge was a life-changing experience for him and him family.

        2.     <u>The Purposes of Criminal Punishment</u>.

18 U.S.C. § 3553(a)(2) provides that the sentence imposed needs to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed

educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2)(A)-(D).

The Department of Justice, Bureau of Prisons announced recently that, "the fee to cover the average cost of incarceration for Federal inmates in Fiscal Year 2014 was $30,619.85 ($83.89/day).  80 F.R. 12523 (March 9, 2015) (available at: https://www.federalregister.gov/documents/2015/03/09/2015-05437/annual-determination-of-average-cost-of-incarceration) (last accessed January 29, 2017).

Without minimizing Mr. Benally' conduct, a sentence of time-served followed by a three (3) year term of supervised release in which United States Probation can ensure that Mr. Benally continues to work, support his family, and continue with counseling, is sufficient to reflect the seriousness of his offense, to promote respect for the law, and to provide just punishment for Mr. Benally, without having to spend nearly $84.00/day additional unneeded expenses, and continue to victimize Mr. Benally while incarcerated.  All these sentencing goals can be overwhelmingly addressed during his three (3) year term of supervised release.  *See* 18 U.S.C. § 3553(a)(2)(A).

"[T]here is little evidence that increases in the severity of punishment yield strong marginal deterrent effects."  Steven N. Durlauf and Daniel S. Nagin, The Deterrent Effect of Imprisonment, *Controlling Crime: Strategies and Tradeoffs* 43 (University of Chicago Press 2011) (available at http://www.nber.org/chapters/c12078.pdf).  Instead, the *certainty* of punishment provides nearly all the deterrent effect

that can be had from law enforcement.  *See, e.g., id.*  "[O]ne policy relevant implication of our conclusions is that lengthy prison sentences . . . cannot be justified based on their deterrent effect on crime."  *Id.*, at 44.  Instead, policing and effective probation supervision provide the maximum deterrence by raising the likelihood of crimes being detected.  *Id.*, at 44 and 70-71 (discussing empirical research showing that certain but minimal sanctions of 1-2 days in custody increase compliance overall).  Therefore, additional imprisonment will provide no additional and meaningful deterrent effect.  *See* 18 U.S.C. § 3553(a)(2)(B).

Effective supervision will address the remaining two purposes of criminal punishment – protecting the public from any *possible* future crimes by Mr. Benally, and to provide needed counseling and treatment.  18 U.S.C. § 3553(a)(2)(C) and (D).  Mr. Benally presents no threat to him community – he has no prior criminal convictions, and he did not start the fight he pleaded guilty to.  U.S. Probation will provide him with additional opportunities and resources to continue to receive counseling, which, coupled with this very rigorous work schedule and supporting his family will prevent him from committing any future crimes.  *See* 18 U.S.C. § 3553(a)(2)(C) and (D).

3. <u>The Kinds of Sentences Available;  The Available Sentencing Range; Any Pertinent Policy Statement; The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records</u>.

Mr. Benally's should receive a time-served sentence based on a total offense level of 10, Criminal History Category I.  The Second PSR, (Doc. 224) dated 10/17/19

continues to incorrectly calculate Darren's Base Offense Level at 18, instead of 12. Second PSR, ¶ 31.

Counsel has objected (and will file another objection to the Second PSR (Doc. 224) to the guideline calculations in paragraphs 31-39, and 71.

There is no unwarranted sentence disparity at play here because Mr. Benally's criminal history category is zero. On the Navajo Nation, *most defendants* do not commute to work 3 hours round-trip every day, support their family, and do not drink alcohol or use drugs. The facts of Mr. Benally's case are very rare. Even though he acted in self-defense, he took responsibility for his criminal conduct immediately, when the government realized they could not prove Second-degree murder, post-trial.

The facts of this case, and the testimony of the Benally victims will bear out the ongoing violence, abuse and alcoholism by the decedent, N.T. Given these rare fact, a time-served sentence will not result in a sentence disparity.

### 4. The Need to Provide Restitution.

Mr. Benally understands and acknowledges that the Mandatory Victim's Restitution Act applies in this case, Second PSR ¶ 84. Counsel for Mr. Benally thanks U.S. Probation for the receipts attached as Doc. 223-1. Counsel would like to continue to enquire about some of the claimed victim's expenses, including the purchase of twelve (12) Basic Tee [shirts] for $75.29.

If Mr. Benally must serve additional custody time in the Federal Bureau of Prisons ("BOP"), Mr. Benally respectfully requests a recommendation from the Court that he serve him time in a BOP facility in Arizona or Colorado to remain close to his family.

II.     **CONCLUSION**

For the foregoing reasons, Mr. Benally respectfully requests that the Court impose a time-served sentence followed by a three (3) year term of supervised release.

Respectfully submitted,

*/s/ electronically filed*
Amy Sirignano, Esq.
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE #250
Albuquerque, NM  87109
(505) 242-2770
(505) 242-2774 facsimile
amy@abqnmlaw.com

*Counsel for Darren Benally*

**CERTIFICATE OF SERVICE**
I hereby certify that a copy of the foregoing
pleading was sent via the Court's CM/ECF system
to opposing counsel, and U.S. Probation
This 18th day October, 2019.

*/s/ electronically filed*
Amy Sirignano, Esq.