IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                         No: 18-CR-2429-WJ

DARREN BENALLY,

    Defendant.

### DEFENDANT'S OBJECTIONS TO THE SECOND PRESENTENCE INVESTIGATION REPORT (DOC. 224)

**COMES NOW**, Darren Benally, by and through his attorney of record, Amy Sirignano, of the Law Office of Amy Sirignano, PC, and makes the following objections to the Second Presentence Investigation Report ("Second PSR") (Doc. 224).

### OBJECTIONS

1.     **Second PSR First Page.** Ms. Ann McCollum is no longer co-counsel for Mr. Benally. She filed a motion to withdraw (Doc. 229), which the Court granted on October 18, 2019 (Doc. 231).

2.     **Second PSR ¶¶ 1-7.** Part A of the Second PSR continues not to describe the entire history of the case, the Charge(s) and Conviction(s). The PSR should notate that initially, the government filed a Criminal Complaint (Doc. 1, 18-MJ-1097) for Second-Degree Murder in Indian Country on April 5, 2018. An Indictment also charging

1

Second Degree Murder in Indian Country (Doc. 26) was filed on July 27, 2018.  Mr. Benally's case proceeded to trial from Monday, June 24, 2019 through Friday June 29, 2019, (Docs. 196, 200, 201, 202, 203, 204, 205).  The jury deadlocked and could not come to a unanimous verdict on Second Degree Murder and the lesser included offenses of Voluntary Manslaughter and Involuntary Manslaughter  (Doc. 197).  Post-trial, on July 22, 2019, the parties agreed to a plea agreement and a 1-count Information to Involuntary Manslaughter (Docs. 211, 212, 213, 214, 215).

   3.  **Second PSR ¶¶ 9-20.**  Mr. Benally objects that the Offense Conduct/Conduct of Conviction was taken from the government's hearsay reports. The Offense Conduct should be written from the sworn witness statements durin trial. (Docs. 200, 201, 202, 203).  Just because the government's second-degree murder case resulted in a hung jury, there is no prohibition in the caselaw or in U.S.S.G. Section 2B1.2 to the use of the witnesses sworn statements contained in the trial transcripts.

   4.  In *United States v. Nava-Sotelo*, 232 F.Supp.2d 1269, 1273 (D.N.M. 2002), *reversed on other grounds by United States v. Nava-Sotelo*, 354 F.3d 1202 (10th Cir. 2003), the Offense Conduct section of the PSR was comprised "primarily" on the government's case file, despite the defendant's assertions to the contrary. While the defendant in that case pleaded guilty to the charges, he did not concede to all of the facts contained in the government's version of events. *Id.* The Court concluded that "it was improper for the PSR solely to present the government's version in determining [the d]efendant's offense

2

conduct, especially since the facts were disputed, no evidentiary hearing had taken place, and the Court had not yet made any findings with regard to the disputed facts." *Id.* The Court explained that, given inconsistencies in the testimony of several witnesses during the evidentiary hearing (upon which the PSR relied), the Offense Conduct section "should have contained both the government's and [the d]efendant's perspectives, rather than giving the impression that the government's account was the only accurate version of events." *Id.*

5.  Unpublished district court caselaw sometimes references this issue tangentially when the USPO adds an addendum to include trial testimony. For instance, in *United States v. Troup*, 2019 WL 4891122, *3, 9, 46-47 (D.N.M. 2019), the USPO relied on the prosecutor's files rather than evidence produced at trial to prepare the PSR. *Id.* at *9. The defendant objected, asserting that "when there's been at trial, . . . it is inappropriate to use the [AUSA's] file to define the offense conduct." *Id.* (internal quotation marks omitted). The Court characterized the UPSO's actions in this regard as inappropriate and ordered that it prepare an addendum using trial testimony to support the facts stated in the PSR. The USPO complied, and included trial testimony in its second addendum to assert the information in the PSR was accurate. During sentencing, the defendant stipulated to the Court overruling his factual objections to the PSR in light of the second addendum. Following sentencing, the Court sought to determine whether it should strike certain paragraphs in the PSR "because the [USPO]

3

relied on the prosecutors' files to find the facts in these paragraphs rather than the trial transcripts[.]" Given the defendant's stipulation, however, the Court adopted the PSR's facts, as augmented by the second addendum, and the accompanying calculation of the advisory sentence. *Id.* at *3.

6. For purposes of appellate review, a PSR summarizing the defendant's version of events without including trial testimony may be insufficient to supply a comprehensive understanding of the information relevant to sentencing. *See United States v. Zuni*, 506 F.Supp.2d 663, 683 (sustaining defendant's objections to PSR paragraphs summarizing offense conduct based on incriminating statements and ordering that USPO draft summary of what occurred at trial "[t]o ensure that [defendant's] version of events is accurately recorded" and to allow for comprehensive understanding of all relevant information in the event of appellate review).

7. Where the U.S. Probation Office decides to rely on discovery materials and prosecutor's files rather than trial testimony leads to factual inaccuracy in the PSR, however, the Court has an obligation to resolve those factual inaccuracies or face possible reversal/remand on appeal. A defendant who makes a specific allegation of factual inaccuracy regarding the facts stated in the PSR is entitled to a finding regarding the allegation or an on-record determination that no finding is necessary because the controverted matter will not be taken into account during sentencing. Fed.R.Crim.P. 32(i)(3)(B); *United States v. Brown*, 314 F.3d 1216, 1226 (10th Cir. 2003) ("Arguments that

merely challenge the district court's 'application of the guidelines to the facts and not the facts themselves' do not trigger any obligation on the part of the district court to make specific findings." (citing *United States v. Windle*, 74 F.3d 997, 1002 (10th Cir. 1996))); *see generally United States v. Corber*, 2005 WL 767816, *1 (D.Kan. 2005) (declining to rule on defendant's objection that offense conduct portion of PSR came from investigative reports rather than evidence admitted at trial because such matters did not affect sentencing, per Fed.R.Crim.P. 32(i)(3)(B)).

8. Dr. Lauren Dvorsak testified at trial about the death of N.T. While the Office of the Medical Examiner's (OMI) Report found that the cause and manner of death as blunt force trauma, and homicide, respectively, the testimony elicited at trial, by the government from Dr. Lauren Dvorsak, was not as exacting as to the specific "cause of death" as the government would like it to be:

> Q. (By AUSA Spindle) Did you notice anything strange about the decedent's heart?
> A. (By Dr. Lauren Dvorsak) So, he had a lot of natural disease in his heart. He had what are called coronary artery atheromas, or atherosclerosis, or hardening and narrowing of the arteries that supply the heart. Most significantly was his left anterior descending or the front of the heart. That particular artery was critically stenosed at 75%.
> Q. Is that unusual?
> A. That's indicative of advanced heart disease.
> Q. So is it unusual in someone that is the decedent's age?
> A. It's advanced disease for somebody in their fifties to sixties, yes.
> Q. Do you think it would have caused his death alone?
> A. No, I don't think alone. It didn't necessarily cause his death in this case, because he was obviously up and walking around

> based on the history that was provided. So alone, no, I don't think it caused his death.
> Q. Did you receive any toxicology reports back regarding any alcohol in the decedent's blood?
> A. Yes.
> Q. And did the decedent have any alcohol in his blood?
> A. Yes.
> Q. And what does that indicate to you?
> A. So, the decedent, the toxicology reports indicated that in his blood at the time of his death, his blood alcohol concentration was approximately three times that of the legal driving limit almost, nearly. So he was intoxicated. What that means for him, I can't say exactly, because different people have different tolerances, and especially if he had been a chronic alcoholic, he could have developed a tolerance to the effects of alcohol. But in that same range, typically you're getting some decreased consciousness, a little slurring, a little impaired coordination, those sorts of things, typically.
> Q. The decedent's heart issues and intoxication at the time of his death, did you note those as any sort of contributory cause?
> A. Yes, I think both of those contributed to his death.

(Doc. 205, Trial Transcript 6/25/19, pages 334-335). Both N.T.'s heard issues and *intoxication* at the time of the fight contributed to N.T.'s own demise. *Id.* Dr. Dvorsak also explained post-concussive apnea. (Doc. 205, Trial Transcript 6/25/19, pages 336-337).

Furthermore, at trial, Dr. Dvorsak explained to defense counsel and the jury:

> Q. (By Ms. Sirignano) And you and your staff did a CAT scan of the body prior to external and internal examination?
> A. (By Dr. Dvorsak) Correct.
> Q. And in the CAT scan, there was no physical injury to the brain or no real skull fracture; isn't that true?
> A. There's only skull fractures in the sense of facial bones.

6

So that's in the head. But the calvaria, the top part of the head, and the base of the skull, the portion that your brain sits on, there were no fractures there. Additionally, there was no evidence of bleeding in or around the brain. The only evidence of injury, say, to the brain, itself, was that cerebral edema.
Q. And that's brain swelling?
A. Yes.
Q. And you testified that cerebral edema, or brain swelling, can be from lack of oxygen; correct?
A. Yes.
Q. And you testified that he stopped breathing; isn't that true?
A. Yes. It's most likely the mechanism.
Q. When you say it's the most likely mechanism, you found that the significant contributory factors of acute ethanol or alcohol intoxication and cardiovascular disease was present in
[N.T.]; isn't that true?
A. Yes.
Q. And so can alcohol make the brain more susceptible to fatal injury?
A. Yes. So, when combined with blunt trauma, even if there is no necessarily acutely lethal injury inside the head, that concussion can cause that post-concussive apnea, or stopping breathing. But that's more likely to occur when you also have what's called a central nervous depressant on board, and that's
what alcohol is. It functions to essentially depress the brain centers that control breathing and it makes it more likely for somebody to stop breathing especially after blunt trauma.
Q. A concussion would not normally lead to someone's death except in the presence of this amount of alcohol?
A. Not typically. I mean, there's a wide spectrum of concussive injuries that can involve no loss of consciousness to some loss of conscious. There is rare reports in the literature that concussion alone can potentially be lethal. But in this case, I do believe the alcohol played a significant role.
Q. Typically a brain recovers from a concussion; isn't that

7

>true?
>A. Most often, yes. But, again, concussions aren't typically lethal.
>Q. So your testimony today is that [N.T.'s] brain didn't recover, and the significant contributory factor was the alcohol?
>A. Correct.

(Doc. 205, Trial Transcript 6/25/19, pages 343-345).

9. The significant contributory factor of N.T.s death was *his own voluntary intoxication*. Dr. Dvorak opined, "the mechanism" of his death, was that N.T. stopped breathing. (Doc. 205, Trial Transcript 6/25/19, pages 344, lines 10-12.

10. There was no bleeding around the brain, no cranial fractures from the fight. (*Id.*, Doc. 205, Trial Transcript 6/25/19, page 343, lines 23-25; page 344, lines 1-4).

11. Mr. Benally respectfully requests that the Offense Conduct section of the PSR be amended to include the Office of the Medical Examiner's complete statement at trial regarding cause and manner of death.

12. Mr. Benally's conduct should be accurately identified and reflected that he acted in self-defense, which the facts support and the reason why the jury did not convict on second-degree murder. The evidence showed that Mr. Benally used sufficient force to defend himself, and that "when he stopped [punching], I stopped." *See* Doc. 221, page 8, citing, Doc. 104, Government's Trial Exhibits 18, and demonstrative transcript, page 85, lines 2-15); Bates USA v. Darren Benally 000376. The words over twenty time came from the FBI Agent, not Mr. Benally. *Id.*

8

13.     **Second PSR ¶ 12.**  Deano Benally testified at trial.  His sworn testimony should be the evidence in the PSR regarding what transpired that evening.  He was the first witness to the scene. (Doc. 204, Trial Transcript 06/24/2019, page 187).

14.     **Second PSR ¶ 18.**  It should be noted that N.T. was a chronic alcoholic. *See* Exhibit A, N.T. medical records from December 31, 2012, and anticipated witness testimony at sentencing.

15.     **Second PSR ¶ 20.**  The summation paragraph is inconsistent with the trial testimony.  N.T. fell to the ground holding Mr. Benally's jacket and shirt (which ripped) (Doc. 104, Government's Trial Exhibit 18, and demonstrative transcript attached hereto, p. 80, lines 17-21).  N.T. was *not* taken to the ground by Mr. Benally. (Doc. 104, Government's Trial Exhibit 18, and demonstrative transcript attached hereto, p. 80, lines 17-21)("Q: When he fell down, do you remember if he went face first, or did he go backward? Do you remember? A: um, yeah, sort of kind of, like sideways.")

16.     Mr. Benally didn't *estimate that it was over twenty [hits/punches]*. (Doc. 104, Government's Trial Exhibit 18 and demonstrative transcript attached hereto, page 84, lines 2-25; page 85, line 1-15).

17.     This "over twenty [hits punches]"is a fiction that the FBI Special Agent created when he continuously asked Mr. Benally leading questions in his non-native language.  (Doc. 104, Government's Trial Exhibits 18 demonstrative transcript attached hereto, page 84, lines 19-23)(" Q: More than 10 [hits], more than 20? A: Yeah. Q: Okay.

A: I don't know. I got tired of it. I just –"); Doc. 38, Exhibit 1a.  A more-accurate review of Mr. Benally's post-arrest statement to law enforcement (Doc. 38, Exhibit 1a), clearly provides that Mr. Benally stated that he did not know how many times he hit N.T. – especially after he was lead by the Special Agent to agree with him *throughout* the entire post-arrest statement.

18.     The trial record is absolutely replete of evidence that "Mr. Benally used his "full force to strike N.T." and "did not stop until N.T. stopped moving." The evidence showed that Mr. Benally used sufficient force to defend himself, and that "when he stopped [punching], I stopped." (Doc. 104, Government's Trial Exhibits 18, and demonstrative transcript, page 85, lines 2-15); Bates USA v. Darren Benally 000376).

19.     N.T. was already deceased when emergency personnel arrived on the scene.  (*See generally*, Doc. 204, page 212 – 228, trial testimony of Doreen Williams).

20.     U.S. Probation did not discuss that Mr. Benally was acting in self-defense, which is absolutely improper. The government moved to exclude the defense of self-defense (Doc. 37, page 3), but it was denied (Docs. 156, 166, 192, 193, page 13, Jury Instruction No. 10).  During the pretrial hearing the Court conducted a review of the pre-trial evidence and concluded that it supported a self-defense jury instruction.  (*See generally*, Doc. 176, Pretrial Conference Transcript 06/18/2019, pages 8 – 13, ).

> By Ms. Sirignano: First of all, alcoholism by the victim decedent
> played a major part in this instance. He was .27 or .29
> postmortem. So we have a right to present evidence regarding

>     my client's mens rea, and at the time this event happened, he
>     knew that when the defendant -- excuse me; when the victim,
>     the
>     decedent, was drunk, he was violent, and he swung out and
>     lashed at not only him, he carried a knife, he also did this
>     with other members of the community. It goes directly to our
>     defense of self-defense. And the Defendant had knowledge of
>     that, and the whole community had knowledge of that.

(Doc. 176, Pretrial Conference Transcript 06/18/2019, pages 8, lines 4-13).

21.     **Second PSR ¶¶ 23, 24, 25.**  The death of N.T. affected his entire family, including the Benally family who lived next to N.T. for decades.  This victim impact statement devalues the entire Benally family, as it is very one-sided.   No one from the Benally family was interviewed for their victim impact statement.  N.T. was related to Darrell Benally, Deano Benally, and others, whose victim impact interviews were not sought.

22.     Moreover, defense Counsel was not provided a copy of the family statements by C.T. and T.T.  Very respectfully, Counsel requests reports and/or notes of interviews with C.T. and T.T. forthwith.

23.     Throughout the duration of the case, T.T. has been known to have been very emotional and caused additional distress (involving the Navajo Nation Police) the night of N.T.'s death.  (Doc. 176, Pretrial Conference Transcript 06/18/2019, pages 129-132).

24.     Additionally, police officer Lojan Dennison notated in her reports that T.T. was "hysterical" (Bates USA v. Darren Benally 016).

11

25.     During Mr. Benally's trial, the CSO's were aware of the family dynamics and during every courtroom break, they kept the families apart. The aggressive nature of T.T. and her family provoked the daily trial stress for everyone.

26.     At sentencing, one of Mr. Benally's family members will testify, that prior to trial, T.T. and her family created a scene at N.T.'s funeral. During trial, T.T. and her family sneered at them, were aggressive towards them, and spoke badly to them (mostly in Navajo so the CSOs and others did not know what they were saying), specifically, to Mr. Darrell Benally, Kathleen Benally, Deano Benally, and Doreen Williams. The aforementioned Benally's are also direct victims in this unfortunate incident, and under the law, should be treated accordingly.

27.     T.T.'s *extremely limited* rebuttal testimony at trial (Doc. 205, Trial Transcript 06/25/2019, pages 438-439) did not provide any evidence, other than she was related to N.T. and she saw him the Friday before he died and he had no visible injuries. *Id.* T.T. has been trying to get a platform for her complaints for many, many months, and her veracity is questionable.

28.     For example T.T. created the wedge between the families – running into the Benally house looking for Darren the night he was arrested and being absolutely chaotic and unpredictable since her Uncle's death. (Bates USA v. Darren Benally 016).

29.     T.T. was a subject to a defense objection (Doc. 147) so her emotional testimony would not sway the jury – she had no first-hand knowledge of the incident.

(Docs. 171, 187). The Court ruled she did not have first-hand knowledge of the incident, her testimony would be cumulative, and irrelevant.

30. Counsel was contacted by Ms. Carol Smith on October 8, 2019. She advised that N.T.'s mother, R.T. passed away. N.T.'s mother's family would like the Benally family to attend the services and functions for R.T, and to provide donations for her service. Neither the defendant, or his entire family are responsible for the "wedge" that exists among family members.

31. **Second PSR ¶ 28.** The defense recognizes that the Mandatory Victim's Restitution Act applies in this case. Counsel for Mr. Benally would like to continue to enquire about specific charges, $75.29 for the purchase of 12 Basic Tee [shirts].

32. **Second PSR ¶¶ 29, 38.** If the Base Offense level is calculated by the Court at level 18, a three-level (3) adjustment for Acceptance of Responsibility should be given to Mr. Benally.

33. Mr. Benally accepted responsibility for the alleged offense as soon as he legally could. Section 3E1.1(b) of the United States Sentencing Guidelines provide for an additional reduction of 1 level if the defendant's offense level is greater than 16, and the defendant timely entered a plea of guilty. U.S.S.G. § 3E1.1(b). As stated above, the government, within five (5) days of Counsel entering her appearance, advised it "might get approval for a plea agreement between voluntary manslaughter and second degree

murder," (Email from AUSA Raquel Ruiz-Velez to Counsel, May 10, 2018), that position never changed.

34.     Counsel spoke directly to Supervisory AUSA Kyle Nayback (outside the Courtroom) while the jury was still deliberating, and she offered a plea to involuntary manslaughter. SAUSA Nayback said we should wait for the jury, which the parties did.

35.     Counsel *immediately negotiated* with the government to secure a *fair and reasonable* plea agreement, based on the post-trial voluntary statement of the foreman to the Court and the parties. The foreman stated that eleven (11) jurors' saw the evidence supporting an involuntary manslaughter conviction. One (1) juror thought the evidence supported voluntary manslaughter. *Not one juror* believed the evidence supported a second-degree murder charge or conviction. There is no question of timeliness in entering into a *fair and reasonable* plea agreement, based on the evidence. The government expended its own resources by mis-evaluating the evidence, and by not offering a plea that was based on the totality of the facts and circumstances of the case.

36.     This Court should not consider the government's position to deny Mr. Benally his third point for acceptance of responsibility. He again will accept responsibility for his conduct during the sentencing hearing.

37.     The government's refusal to move for the additional third-point is not supported by any motive, other than an unconstitutional one, and is not rationally

related to a legitimate government end. *United States v. Salas*, 756 F. 3d 1196, 1204 (10th Cir. 2014). In *Salas*, the Court reviewed *United States v. Lee,* 653, F. 3d 170, 174 (2nd Cir 2011). The *Lee* Court opined, " [t]he court, not the government, imposes sentence, and the court is entitled to a full and accurate record -- as are the parties -- before sentence is imposed. As long as the defendant disputes the accuracy of a factual assertion in the PSR in good faith, the government abuses its authority by refusing to move for a third-point reduction because the defendant has invoked his right to a hearing. *Lee*, 653 F. 3d at 174.

38.	The *Lee* court further held, "[a] recent decision of the Fourth Circuit is instructive. In *United States v. Divens*, 650 F.3d 343, (4th Cir. 2011), the defendant refused to sign a plea agreement waiving his right to appeal. The government declined to move for the third-point reduction under § 3E1.1(b) on the grounds that the defendant's refusal to sign an appeal waiver would mean that the government would have to expend resources to defend an appeal. (citation omitted) Relying on the plain language of § 3E1.1(b) and its commentary, the Fourth Circuit held that the government could not refuse to make the motion on this basis. (citation omitted) The court held that §3E1.1(b) 'instructs the Government to determine simply whether the defendant has 'timely' entered a 'plea of guilty' and thus furthered the guideline's purpose in that manner. It does not permit the Government to withhold a motion for a one-level reduction because the defendant has declined to perform some other act to assist the

15

Government.' (citation omitted) These observations apply with equal force here." *Lee*, 653 F. 3d at 175.

39. Mr. Benally has a due process right to proceed to trial based on the government's witnesses and evidence. The government was unreasonable by not properly evaluating the evidence and did not offer a reasonable plea agreement to Mr. Benally.  Even before the jury returned its note saying it was deadlocked, Counsel for Mr. Benally requested a plea from Supervisory AUSA Kyle Nayback.   The government's request is punitive, unconstitutional, and should be denied.

40. **Second PSR ¶¶ 31-40.**  Counsel for Mr. Benally very respectfully objects to the offense level computation in paragraphs 30-40.

41. Throughout this process, Counsel and U.S. Probation spoke in-person, telephonically, and via email about Mr. Benally's conduct.  Mr. Hunt's initial opinion was that Mr. Benally's conduct was criminally negiglent, or at an offense level 12, and he was facing a time-served sentence, ten (10) to sixteen (16) months' imprisonment.

42. **Second PSR ¶ 31.**  The correct base offense level is 12, not 18.  Mr. Benally's conduct was criminally negligent, not reckless.

43. Criminally negligent "means conduct that involves a gross deviation from the standard of care that a reasonable person would exercise under the circumstances, but which is not reckless.  Offenses with this characteristic usually will be encountered as assimilative crimes." U.S.S.G. § 2A1.4, Application Notes, Definitions, paragraph 1;

16

*United States v. McHugh*, 122 F.3d 153, 156-157 (2nd Cir. 1997)(discussion of awareness for reckless standard and gross deviation of standard of care for criminally negligent standard).

  44.  Reckless "means a situation in which the defendant *was aware of* the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." (emphasis added). "Reckless" includes all, or nearly all, convictions for involuntary manslaughter under 18 U.S.C. § 1112. A homicide resulting from driving a means of transportation, or similarly dangerous actions, while under the influence of alcohol or drugs ordinarily should be treated as reckless. U.S.S.G. § 2A1.4, Application Notes, Definitions, paragraph 1; *United States v. Naghani*, 361 F.3d 1255, 1263 (9th Cir. 2004)("To the extent Naghani raises his intoxication as a challenge to the district court's finding of recklessness, that claim is rejected. Naghani had been involved in previous drunk-driving incidents and admitted that he was 'afraid to fly,' had 'a tendency to become garrulous under the influence of alcohol' and sometimes lost control of his actions when intoxicated. Naghani therefore should have known that 'the combination of intoxication and air travel could lead to dangerous consequences.' Citing *United States v. Jenny*, 7 F.3d 953, 957 (10th Cir. 1993)(holding that the defendant had the 'foreknowledge' required of recklessness).

45. Mr. Benally's conduct was not reckless. His behavior does not come close to the behaviors of defendants McHue and Naghani. He was neither in an automobile, and was *not under the influence of alcohol or drugs*. He was minding his own business and was cleaning up in the yard when he was swung at by his uncle. He used only the force necessary to stop his uncle from fighting with him. (Exhibit 18 demonstrative, page 85, lines 2-15. He used no more force than necessary than to stop the fight. *Id*. There is no evidence to show that Mr. Benally was "aware of the risk" to defend himself after N.T. started a fight with him, and that N.T. would stop breathing after he was hit.

46. **Second PSR ¶¶ 31, 39, 71.** The correct base offense level is 12, not 18. Mr. Benally's conduct was criminally negligent, not reckless. The Total Offense Level should be 10, not 16.

47. **Second PSR ¶ 47.** Mr. Benally was senselly attacked and he requested to move out of the detention pod for his safety. The other detainee fought with Mr. Benally. Mr. Benally has been misunderstood and has been jumped, at least twice, by other inmates at the Cibola County Detention Center. Defense counsel obtained a copy of Mr. Benally's medical records to corroborate that he was attacked in the Cibola County Detention Center. *See* Exhibit B. Mr. Benally was seen by the medical staff at Cibola County for injuries he sustained.

48. **Second PSR ¶¶ 49, 50, 51, 52.** The government advised the United States Magistrate Judge at the detention hearing that Mr. Benally's arrests were either

dismissed or uncharged.  The FBI Agent or the Prosecutor could verify this information if it has not yet been received by the Navajo Nation.

49.     **Second PSR ¶ 56.**  The language of the PSR, specifically, "the conduct in the instant offense created quite a wedge in the defendant's family," to C.T. and T.T. describe there is a wedge they feel in the family." The wedge has been created by C.T. and T.T., *not* based on Mr. Benally's conduct.

50.     **Second PSR ¶ 59.**  N.T.'s family no longer reside in Santostee, NM next to the Benally homestead.  N.T.'s mother recently passed away.  C.T. and T.T. both live in Farmington, NM, and the Sanostee, NM house is vacant.  There also is a pending legal issue about whether C.C. and T.T. remain to qualify to have the homesite lease since N.T. and N.T.'s mother recently passed away.

51.     **Second PSR ¶ 82.**  See objection, ¶ 21, above.

52.     **Second PSR ¶ 87.**  The total offense level should be 10, resulting in a guildeline sentence of 6-12 months imprisonment.

## CONCLUSION

For the foregoing reasons, Mr. Benally respectfully requests that the Court accept his objections to the Second Presentence Investigation Report (Doc. 224), to reflect the above.

Respectfully submitted,

 /s/ *Electronically Filed*
Amy Sirignano, Esq.
Law Office of Amy Sirignano, PC
5901J Wyoming Blvd. NE #250
Albuquerque, NM  87109
(505) 242-2770
(505) 242-2774 facsimile
amy@abqnmlaw.com

*Counsel for Darren Benally*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system to opposing counsel, and to U.S. Probation this 28th day of October, 2019.

 /s/ *Electronically Filed*
Amy Sirignano, Esq.